**INLAND STEEL COMPANY and Bethlehem Steel Corporation, Petitioners,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and William K. Reilly, Administrator thereof, Respondents.**

Nos. 89–1405, 89–1442.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1990.

Decided May 8, 1990.

Rehearing and Rehearing En Banc Denied June 12, 1990.

**1420**

Dean A. Calland, David P. Pusateri, Babst, Calland, Clements & Zomnir, Pittsburgh, Pa., for Inland Steel Co.

Nandan Kenkeremath, E.P.A., J. Carol Williams, Jeffrey P. Kehne, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Charles H. Sutfin, E.P.A., Region 5, Water Div., Chicago, Ill., for respondents.

Bryan G. Tabler, Lawrence A. Vanore, Barbara A. Fruehling, Barnes & Thornburg, Indianapolis, Ind., for Bethlehem Steel Corp.

Before POSNER, FLAUM, and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

■ Two steel companies challenge orders by the Environmental Protection Agency requiring them to take corrective action under section 3004(u) of the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendments Act of 1984, 42 U.S.C. § 6924(u). The legal and technical matrix in which this challenge is embedded is immensely complex, but the complexities are irrelevant, so we shall simplify ruthlessly. While on the subject of simplification, we point out that there is no point in naming the Administrator of the Environmental Protection Agency as a respondent in a petition to review an order of the agency.

The companies manufacture steel in northern Indiana, producing as an unwanted by-product liquid wastes containing ammonia and other hazardous chemicals. Pipes carry these wastes to five deep injection wells on the companies' property. Drilled fifteen years ago, these wells range in depth from 2,500 to more than 4,000 feet. They end in porous rock. The wastes are forced down the wells and into the rock under pressure, and fill the pores in the rock. The bottoms of the wells are more than a quarter mile below the lowest aquifer from which drinking water is obtained and below any other ground waters known to be connected to surface waters. Not only is the zone in which properly sited deep injection wells terminate one of porous rocks, but above it is a layer of impermeable rock so that the wastes cannot seep back up. Hartke, Hill & Reshkin, Environmental Geology of Lake and Porter Counties, Indiana, at 37 (Ind.Dept. of Natu-

ral Resources 1975); see generally Brower *et al.,* Final Draft Report: Evaluation of Current Underground Injection of Industrial Waste in Illinois, at 4–35 to 4–53 (Illinois Dept. of Energy and Natural Resources, March 1986). The wells are elaborately sheathed to prevent leakage before the wastes reach the bottom.

There have been no complaints of leakage from the companies' wells and—as yet anyway—no complaints of harm or even danger to health (or to other good things) from the wastes that have been disposed of down these wells. Not that they have really been "disposed of"; in effect they are being stored in the porous rock at the bottom of the wells. The EPA has no plans to restrict the operation of the wells and one may wonder therefore why it insists that the wells are disposing of "solid wastes" as that term is defined in section 1004(27) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6903(27). The answer appears to be that under section 3004(u) of the Act no one may obtain a permit to dispose of solid wastes without taking corrective action with respect to *all* solid waste management units on the property, even inactive units. True, the statutory term is "facility," not "property," but, with support from section 3004(v), 42 U.S.C. § 6924(v), the EPA has interpreted the term to include "all contiguous [to the actual solid waste disposal facilities] property under the owner or operator's control." *Hazardous Waste Management System: Final Codification Rule,* 50 Fed. Reg. 28702, 28712 (1985). The interpretation has been upheld. *United Technologies Corp. v. EPA,* 821 F.2d 714, 721–23 (D.C.Cir.1987). The steel companies have several inactive waste management units on the same properties that the deep injection wells are on, so if the wells are disposing of solid wastes within the meaning of the Act the companies will be required to take corrective action with respect to the inactive units even though the EPA seeks no change in the operation of the wells. The costs of cleaning up inactive solid waste management units—units in which wastes may have been stored for many years and become highly toxic—can be im-

mense. It is these costs that the companies seek to avoid by arguing that their deep injection wells are not solid waste disposal facilities within the meaning of the Resource Conservation and Recovery Act and hence that the EPA's orders directing corrective action are invalid.

In their briefs the companies opened a second front by attacking a brace of regulations that requires the owners of deep injection wells that do dispose of solid wastes to comply with the Resource Conservation and Recovery Act. 40 C.F.R. §§ 270.1(c)(1)(i), 270.60(b). At argument they abandoned this ground on the strength of the just-decided *American Iron & Steel Institute v. EPA,* 886 F.2d 390, 396 (D.C.Cir.1989); see also *United Technologies Corp. v. EPA,* 821 F.2d 714 (D.C.Cir.1987). So while contesting the EPA's determination that their deep injection wells are solid waste disposal facilities, the companies no longer contest the proposition that if they are they are subject to the Resource Conservation and Recovery Act. Nor do the companies suggest that the fact that the EPA is more interested in their inactive waste management units than in their deep injection wells precludes interpreting the Resource Conservation and Recovery Act to cover such wells, or that the wells could not be "solid waste" disposal facilities because they are disposing of liquid wastes. We are in a statutory Cloud Cuckoo Land in which "solid waste" expressly includes liquid wastes. 42 U.S.C. § 6903(27). This same subsection, however, contains the statutory language on which the companies do rely: "The term 'solid waste' ... does not include ... solid or dissolved materials in ... industrial discharges which are point sources subject to permits under" section 402 of the Clean Water Act, 33 U.S.C. § 1342. The companies argue that the wastes that they pump into their deep injection wells are industrial discharges and that a deep injection well is a point source within the meaning of the Clean Water Act because pollutants might be discharged from them. 33 U.S.C. § 1362(14). If they are right on both counts and therefore subject to the permit

requirements of section 402 of the Clean Water Act, then the wells are not solid waste disposal facilities and are not regulable under the Resource Conservation and Recovery Act.

■ Section 402 of the Clean Water Act authorizes the states to administer a system of required permits for the discharge of pollutants into navigable waters, defined as waters of the United States, 33 U.S.C. § 1362(7), subject to a variety of conditions including that the state's permit program must "control the disposal of pollutants into wells." 33 U.S.C. § 1342(b)(1)(D). (For these purposes, the injection of water, gas, or other materials into a well to facilitate the production of oil or gas is not considered the disposal of pollutants. 33 U.S.C. § 1362(6)(B).) Indiana has issued permits to Inland and Bethlehem that both limit the total volume of wastes that they may pump down the wells and require adherence to the wells' design parameters, although the permits do not limit the amounts of any specific pollutants that may be sent down the wells. The existence of these permits may seem to make the companies' case, but it does not. The exemption in the Resource Conservation and Recovery Act is for discharges subject to the permit requirements of section 402 of the Clean Water Act, not for possession of a permit as such. The companies have *begged* Indiana to continue including the deep injection wells in the permits that it periodically renews, though the state has no desire to include them because it does not think that these particular wells pose any menace to navigable waters, however broadly defined. The companies argue that with a permit they are exempt from the Resource Conservation and Recovery Act. They are wrong. They must be *required* by the Clean Water Act to have a permit.

In arguing that they are not required to have such a permit, the EPA urges a distinction between "discharge" and "disposal." The exemption in the Resource Conservation and Recovery Act is for "discharges," and the EPA argues that what deep injection wells do is better described as "disposal," which the Act defines as "the *discharge,* deposit, *injection,* dumping, spilling, leaking, or placing of any solid waste." 42 U.S.C. § 6903(3) (emphasis added). The argument is that all "discharges" are "disposals," but not all "disposals" are "discharges"; some are "injections." The Act does not exempt disposals that are not discharges. The agency also relies on a new provision in the 1984 amendments to the Act. This provision defines "land disposal" to include "any placement of hazardous waste in ... a[n] injection well," 42 U.S.C. § 6924(k), but does not authorize corrective action under section 3004(u), and that is the provision under which the challenged orders were issued. So the agency's second strut collapses, and we must consider whether deep well injections are disposals, but not discharges; only if the answer is "yes" can the EPA prevail.

The Clean Water Act seeks to protect navigable waters by limiting discharges into them. 33 U.S.C. § 1251(a)(1); *EPA v. California,* 426 U.S. 200, 203, 96 S.Ct. 2022, 2024, 48 L.Ed.2d 578 (1976). A well that injects wastes more than a quarter mile below the lowest known aquifer is not discharging wastes into navigable waters. There is some water in the rocks into which the wells pump, but the companies do not suggest that it is connected to any navigable waters. It is true, as we noted earlier, that the Act requires the states, as a condition of being allowed to administer the permit program, to control the disposal of pollutants *through wells,* and nothing in the Act limits the depth of the wells subject to it. But as far as we are able to determine, the Act was not intended to authorize the regulation of *all* wells used to dispose of pollutants, regardless of absence of any effects on navigable waters. We must therefore consider the possibility of such effects from the disposal of pollutants through deep injection wells.

Three such effects can be conjectured. First, a well might end in navigable waters, but these wells do not. Second, since the legal concept of navigable waters might include ground waters connected to surface waters—though whether it does or not is an unresolved question, *Exxon Corp. v.*

*Train,* 554 F.2d 1310, 1312 n. 1 (5th Cir. 1977); *Kelley v. United States,* 618 F.Supp. 1103, 1105–07 (W.D.Mich.1985); *McClellan Ecological Seepage Situation v. Weinberger,* 707 F.Supp. 1182, 1193–96 (E.D.Cal.1988); cf. *United States v. Byrd,* 609 F.2d 1204, 1209–11 (7th Cir.1979)—a well that ended in such connected ground waters might be within the scope of the Act. But the waters at the bottom of these wells are not connected to surface waters.

Third, wastes leaking through the (upper) casing of even the deepest injection well could pollute navigable waters. This is possible, of course, but in the EPA's current view the connection with navigable waters is too tenuous to bring deep injection wells under the Clean Water Act. It is, however, the EPA's former view, and the one we accepted in *United States Steel Corp. v. Train,* 556 F.2d 822, 851–53 (7th Cir.1977). (The Fifth Circuit reached the contrary conclusion six weeks later, *Exxon Corp. v. Train, supra,* 554 F.2d at 1317–30, without citing our decision, which had not yet been published in the *Federal Reporter* advance sheets.) At issue in *United States Steel Corp.* was the EPA's authority to regulate steelmakers' deep injection wells under the Clean Water Act. (This was before Indiana had taken up the congressional invitation for states to administer the clean water permit program as the EPA's surrogates.) The principal basis of our conclusion was the breadth of the provision requiring control of wells, 33 U.S.C. § 1342(b)(1)(D), a breadth we thought underscored by the exclusion of oil and gas wells only. 556 F.2d at 852. We noted in passing that too little was known about deep injection of wastes to require the EPA to disregard the possibility that those wastes might find their way into navigable waters after all. *Id.* at 852 n. 61.

■ Suppose we now know (or we defer to the EPA's present view) that this possibility is nil. This would weaken *United States Steel Corp. v. Train*—how badly we need not decide—but would not dictate the outcome of the present case. If *United States Steel Corp.* is all wet, then the steel companies are not required to obtain per-

mits for deep injection wells under the Clean Water Act and the exemption in the Resource Conservation and Recovery Act is inapplicable. Yet even if the decision stands and Clean Water Act permits are required for these wells, this would not invalidate the EPA's orders in the present case, because the exemption in the Resource Conservation and Recovery Act is limited to discharges; it does not extend to all activities that the state might regulate under the Clean Water Act. *United States Steel Corp.* did not hold that deep injection wells are subject to the Clean Water Act because they are point sources of industrial *discharges,* but if they are not then the exemption does not come into play.

■ The fact that our decision in *United States Steel Corp.* may have exaggerated the danger that deep injection wells pose to navigable waters can only strengthen the EPA's position in the present case, paradoxical as this may seem. The Clean Water Act is designed for the protection of navigable waters. To use that Act to exempt from the Resource Conservation and Recovery Act a form of waste disposal that if it poses any environmental hazard poses it to a part of the environment other than the navigable waters of the United States would itself be paradoxical. The purpose of the exemption in section 1004(27) of the Resource Conservation and Recovery Act, so far as we can discern it, is to avoid duplicative regulation, not to create a regulatory hole through which billions of gallons of hazardous wastes can be pumped into the earth without any controls provided they are pumped deeply enough to endanger neither navigable waters nor the supply of drinking water, the latter being protected by the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.*

But if deep injection endangers neither navigable waters nor drinking water, does this not mean that it must be harmless, and if so why worry that it might fall between regulatory stools? It may not be harmless. Deep injection could have adverse effects on navigable waters or drinking water that were too indirect or long run to fall under the mantle of these statutes, and in addi-

tion it could contaminate mineral resources in the injection zone. Final Draft Report, *supra*, at 4–50. A subtler objection to the EPA's interpretation is that although there may be a regulatory gap if the Resource Conservation and Recovery Act is held inapplicable, it may be small relative to the costs of cleaning up the properties containing deep injection wells. As we suggested at the outset of this opinion, it appears that what the EPA is really up to is using the wells as an excuse for forcing the companies to clean up—at great expense—other waste disposal sites on the properties containing the wells. This may be, but the companies do not argue that the EPA's ulterior motives invalidate an objectively reasonable interpretation of the statute.

We reach the conclusion that deep well injection is subject to the Resource Conservation and Recovery Act not because the dictionary requires us to distinguish between discharge and disposal, as of course it does not. We reach it because a failure to make the distinction would create a senseless regulatory gap, though at the moment, given what is known about properly sited deep injection wells—and there is no argument that these companies' wells are not properly sited—not a particularly ominous one. Regulation is not a seamless whole, and when the seam reflects a compromise we are duty-bound to honor it if constitutional. *Rodriguez v. United States*, 480 U.S. 522, 525–27, 107 S.Ct. 1391, 1395–96, 94 L.Ed.2d 533 (1987) (per curiam); *Friedrich v. City of Chicago*, 888 F.2d 511, 518 (7th Cir.1989). But we can find no indication that Congress intended to exempt the owners of deep injection wells from regulation under the Resource Conservation and Recovery Act, and the language of the Act does not so compellingly prescribe such a result that we must do or die without reasoning why. If the language does not compel, neither is it deformed by, the EPA's interpretation, to which we owe some, perhaps considerable, deference, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), and which is supported by the policies that appear to animate the

Act and rebutted by no other sources of interpretive wisdom.

AFFIRMED.