**The State of NEW YORK, Plaintiff,**

v.

**PVS CHEMICALS, INC. (New York), Defendant.**

**No. 97–CV–596A.**

United States District Court, W.D. New York.

Nov. 4, 1998.

Timothy Hoffman, NYS Attorney General's Office, Buffalo, NY for plaintiff.

David L. Roach, Blair & Roach, Tonawanda, NY, for defendant.

## ORDER

ARCARA, District Judge.

The above-referenced case was referred to Magistrate Judge Carol E. Heckman pursuant to 28 U.S.C. § 636(b)(1)(B), on August 26, 1997. On December 8, 1997, defendant moved to dismiss the complaint. On July 7, 1998, Magistrate Judge Heckman filed a Report and Recommendation, recommending that defendant's motion be converted to a motion for summary judgment, and that summary judgment be granted to the extent that it seeks to limit plaintiff's claims for statutory civil penalties to the alleged SPDES permit violations occurring after May 24, 1992, and to the extent it seeks dismissal of Claim Two. Magistrate Judge Heckman recommended that the motion be denied in all other respects.

Defendant filed objections to the Report and Recommendation on July 20, 1998 and plaintiff filed a response thereto on August 7, 1998. Oral argument on the objections was held on October 22, 1998.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have

been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation, with one exception. With respect to claims three, four, five, six, eight, and nine, the Court grants summary judgment only to the extent these claims relate to the discharge of non-contact cooling water as these claims are not properly brought under the Resource Conservation and Recovery Act. In all other respects, however, these claims may go forward.

Accordingly, defendant's motion is granted to the extent that it seeks to limit plaintiff's claims for statutory civil penalties to the alleged SPDES permit violations occurring after May 24, 1992, to the extent it seeks dismissal of Claim Two, and to the extent it seeks dismissal of claims three through six, eight and nine only with respect to the discharge of non-contact cooling water. The motion is denied in all other respects. The case is referred back to the Magistrate Judge for further proceedings.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION AND ORDER

HECKMAN, United States Magistrate Judge.

This matter was referred to the undersigned by the Hon. Richard J. Arcara, to hear and report, in accordance with 28 U.S.C. § 636(b). Defendant has moved to dismiss the complaint, and to stay discovery pending the determination of its motion to dismiss. Plaintiff has moved for leave to amend the complaint. For the following reasons, it is recommended that defendant's motion to dismiss be converted to a motion for summary judgment, and that it be granted in part and denied in

part. Defendant's motion to stay discovery is denied. Plaintiff's motion for leave to amend is granted.

## BACKGROUND

The complaint in this action was filed on July 24, 1997, by the State of New York [1] against PVS Chemicals, Inc. ("PVS"), seeking statutory civil penalties and injunctive relief for alleged violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA"); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"), Articles 17 and 19 of the New York Environmental Conservation Law ("ECL"), and the common law of public nuisance (Item 1). As alleged in the complaint, PVS operates a chemical manufacturing facility located on the banks of the Buffalo River. PVS manufactures several chemical compounds at the facility, including sulfuric acid. The manufacturing process generates excess heat, requiring the use of approximately 6,000,000 gallons of water per day to cool the production equipment. The cooling water is drawn from Lake Erie, and is discharged (along with steam condensate, boiler blowdown and storm water) through outfall pipes into the Buffalo River. The discharge of water from the facility is permitted pursuant to a State Pollutant Discharge Elimination System ("SPDES") permit, which sets a specific effluent limit for "pH" of 6.0 to 9.0, and requires PVS to monitor the pH level of the discharge.

According to the complaint, since April, 1991 and continuing to the present, PVS has allowed releases of highly acidic materials to occur at the facility causing the outfall discharge, aquifers and groundwater to become contaminated. The complaint sets forth the following claims for relief:

1. CWA violation for discharge of pollutants, based on alleged releases of

---

1. The action was brought by the State of New York under the "citizen suit" provisions of the CWA, 33 U.S.C. § 1365, and RCRA, 42 U.S.C. § 6972, which authorize citizens (or a state *parens patriae* on behalf of its residents) to bring suit for violations of the Acts in the absence of federal or state enforcement action.

highly acidic materials into the Buffalo River through the outfall pipes which exceed the pH effluent limits of the SPDES permit (citing 33 U.S.C. § 1311(a));

2. RCRA violation for discharge of pollutants, based on those same releases (citing 42 U.S.C. §§ 6944 & 6945);

3. RCRA violation for maintenance of an "open dump," based on the alleged discharges into the river and spilling of acidic materials onto the grounds of the facility (citing 42 U.S.C. §§ 6903(14) & 6945);

4. RCRA violation for disposal of hazardous waste, based on the alleged discharges and spills (citing 42 U.S.C. § 6925);

5. RCRA violation for failure to minimize a threat to health (citing federal and state regulations);

6. RCRA violation for failure to contain or clean up the spills (citing federal and state regulations);

7. RCRA violation for failure to comply with "interim status" standards (citing federal and state regulations);

8. RCRA violation for alleged disposal of solid waste in a "floodplain" (citing federal regulations);

9. RCRA violation for failure to address conditions existing at the facility both before and since PVS became an owner (citing RCRA's "citizen suit" provision, 42 U.S.C. § 6972(a)(1)(B));

10. ECL violation for contamination of groundwater (citing ECL § 17–0501 and state regulations);

11. ECL violation for alleged discharges in violation of SPDES permit (citing ECL § 17–0807(4));

12. Violation of state regulations at 6 N.Y.C.R.R. § 211.2, based on an alleged release of sulfur dioxide gas on June 19, 1996; and,

13. Public nuisance.

On August 13, 1997, PVS answered the complaint, and asserted a counterclaim against the State of New York for "selective enforcement" in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. On August 29, 1997, the State replied to the counterclaim.

On November 7, 1997, after a preliminary pretrial conference, the court issued a scheduling order setting May 8, 1998 as the discovery cutoff, and establishing filing deadlines for motions to join parties or amend the pleadings, dispositive motions, discovery motions and identification of expert witnesses (*see* Item 7). Meanwhile, on November 3, 1997, plaintiff served document requests on defendant. Defendant has not responded to the document requests, and no other discovery has taken place in the case.

Instead, on December 8, 1997, defendant filed a motion to dismiss and/or for summary judgment, along with a motion to stay discovery until a determination is made on its dispositive motion. Defendant contends that each of the thirteen claims in the complaint is either time-barred under the applicable statute of limitations or fails to state a cause of action under the statute, regulation or common law theory cited.

On January 6, 1998, plaintiff responded to defendant's motions. At the same time, plaintiff filed a motion for leave to amend the complaint to augment its Tenth Claim for Relief, and to assert two additional claims, based on facts learned subsequent to the filing of the original complaint.

On February 23, 1998, oral argument of the motions was heard before the undersigned. For the reasons that follow, it is recommended that defendant's motion to dismiss be converted to a motion for summary judgment, and that it be granted in part and denied in part. Defendant's motion for a stay of discovery is denied. Plaintiff's motion for leave to amend the complaint is granted.

## DISCUSSION

### I. Defendant's Motion to Dismiss/Summary Judgment.

Ordinarily, on a motion to dismiss made prior to discovery, the court's determination is confined to the factual allegations in the complaint, which are presumed to be true. *See, e.g., Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Morin v. Trupin,* 835 F.Supp. 126, 129 (S.D.N.Y.1993). The court may not dismiss the complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Where a district court is provided with materials outside the pleadings in the context of a motion to dismiss the complaint, the court "may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material." *Kopec v. Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *see also Livnat v. Shai Bar Lavi, Amlon Publishing Group, Inc.,* 1998 WL 43221, at *2 (S.D.N.Y. Feb. 2, 1998).

In this case, both parties have submitted to the court correspondence, reports, data, violation notices and other materials outside the pleadings. These submissions, reviewed and considered by the court, demonstrate that a relationship existed between the parties for several years prior to the filing of this lawsuit, and that the parties have long been on notice of the regulatory issues raised in the complaint. Accordingly, I find that defendant's motion to dismiss should be treated as one for summary judgment pursuant to Rule 56, and that no further opportunity to submit relevant material is necessary. *See In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986) (inquiry is whether parties should reasonably have recognized possibility that motion might be converted or were taken by surprise and deprived of reasonable opportunity to meet facts outside pleadings); *Gryga v. Ganzman,* 991 F.Supp. 105, 107 (E.D.N.Y.1998) (since both parties filed exhibits and affidavits, neither can complain that they lacked reasonable opportunity to meet facts outside pleadings).

Summary judgment is appropriate if the pleadings, affidavits, exhibits and other materials on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 166–67 (2d Cir.1991). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 248, 106 S.Ct. 2505; *see Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a "metaphysical doubt" concerning the facts, or on the basis of conjecture or surmise. *Bryant v. Maffucci, supra* (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In order to avoid summary judgment, the nonmoving party is under the obligation "to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Burke v. Bevona*, 931 F.2d 998, 1001 (2d Cir. 1991). "Entry of summary judgment indicates that no reasonable jury could return a verdict for the losing party." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, *supra*, 933 F.2d at 167. Stated slightly differently, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir.1994).

### A. Claim One: Statute of Limitations.

■ PVS contends that all allegations in the complaint of discharges in excess of the SPDES permit effluent levels occurring prior to May 24, 1992 are barred by the 5–year federal statute of limitations applied to CWA claims. See 28 U.S.C. § 2462; *Friends of the Earth v. Facet Enterprises, Inc.*, 618 F.Supp. 532, 535–36 (W.D.N.Y.1984) (5–year statute of limitations of 28 U.S.C. § 2462 applies to CWA claim for statutory civil penalties). Plaintiff concedes that § 2462 provides a defense to any claims for civil penalties for the six alleged permit violations occurring prior to May 24, 1992. However, plaintiff also contends that all of the alleged permit violations should remain part of the complaint as evidence relevant to both the claim for injunctive relief and the determination of appropriate civil penalties.

Section 1365(a) of the CWA authorizes citizen suits for injunctive relief and civil penalties based on alleged violations of permit effluent standards. 33 U.S.C. § 1365(a); *see Gwaltney v. Chesapeake Bay Foundation*, 484 U.S. 49, 53, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). While citizen suits may be brought to enjoin and penalize only ongoing violations, as opposed to "wholly past" violations, the plaintiff is required to allege "a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney, supra* at 57, 108 S.Ct. 376.

In addition, § 1319(d) of the CWA provides that, in determining the amount of civil penalties to impose for violations of permit limitations, "the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d). Relevant to the court's consideration of the defendant's "history" is evidence of "the duration of defendant['s] current violations, whether defendant[ has] committed similar violations in the past, and the duration and nature of all of the violations, including whether the violations are perpetual or sporadic." *United States v. Smithfield Foods, Inc.*, 972 F.Supp. 338, 349 (E.D.Va. 1997).

■ Accordingly, I agree with plaintiff that all of the alleged SPDES permit violations should remain in the complaint as relevant to both the scope of injunctive relief and the determination of civil penalties sought by this action.

However, defendant's motion for summary judgment should be granted to the extent that it seeks to limit plaintiff's claim for statutory civil penalties to the alleged SPDES permit violations occurring after May 24, 1992.

### B. Claim Two: Applicability of RCRA to Alleged CWA Violations.

[3] Defendant contends that plaintiff's second claim, which seeks injunctive relief and civil penalties under RCRA based on the same "unauthorized discharges" alleged in the first claim, should be dismissed because the CWA—not RCRA—regulates discharges to navigable waters. Plaintiff responds that discharges exceeding pH effluent levels set in a SPDES

permit are regulable both as "point sources" under the CWA and as "solid waste" under RCRA.

The RCRA statute defines the term "solid waste" as follows:

> The term "solid waste" means any garbage, refuse, sludge from a waste supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of [the CWA]. . . .

42 U.S.C. § 6903(27). The exclusion contained in § 6903(27) for "industrial discharges" is further described in the federal regulations as follows:

> Industrial wastewater discharges that are point source discharges subject to regulation under Section 402 of the Clean Water Act, as amended.
>
> [Comment: This exclusion applies only to the actual point source discharge. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment.]

40 C.F.R. § 261.4(a)(2).

According to plaintiff, defendant's outfall discharges do not fit within RCRA's "industrial wastewater exclusion" because they exceed the effluent levels in the SPDES permit, and are therefore not "pursuant to or authorized by permit" under the CWA. Plaintiff relies primarily on *United States v. Allegan Metal Finishing Co.,* 696 F.Supp. 275 (W.D.Mich.1988), *appeal dismissed,* 867 F.2d 611 (6th Cir. 1989), in which the court found that industrial wastewater from the defendant's metal finishing process discharged into holding ponds was regulable as "solid waste" under RCRA. The defendant in *Allegan Metal* claimed that its discharges to the holding ponds were regulated by state (Michigan) wastewater discharge permits, and were therefore excluded from the definition of "solid waste" under the industrial wastewater exclusion of § 6903(27). The court disagreed, finding it "clear that the exclusion enshrined in the definition of solid waste is for those actual discharges from point sources which are made pursuant to and authorized by a NPDES permit. Further, the regulation that defines 'solid waste' states that '[t]his exclusion applies only to the actual permit discharges.'" *Allegan Metal, supra,* 696 F.Supp. at 281. Since actual point source discharges authorized by permit did not occur until 1987, when the defendant's wastewater treatment plant became operational, discharges to the holding ponds prior to 1987 and pond sludges generated by those discharges, were subject to regulation under RCRA. *Id.*

On February 17, 1995, the Environmental Protection Agency ("EPA") Office of Solid Waste and Emergency Response ("OSWER") issued a Directive entitled, "Interpretation of Industrial Wastewater Discharge Exclusion from the Definition of Solid Waste," reprinted at 1995 WL 911821 (OSWER). The purpose of this Directive was "to clarify that [RCRA] requirements apply to discharges of leachate into groundwater from leaking waste management units, even when the groundwater provides a direct hydrologic connection to a nearby surface water of the United States." *Id.* at *1. As explained by OSWER:

> EPA has consistently interpreted the language "point sources subject to permits under [. . . the Clean Water Act]" to mean point sources that should have a NPDES permit in place, whether in fact they do or not. Under EPA's interpretation of the "subject to" language, a facility that should, but does not, have the proper NPDES permit is in violation

of the CWA, not RCRA.... The obvious purpose of the industrial point source discharge exclusion ... was to avoid duplicative regulation of point source discharges under RCRA and the Clean Water Act. Without such a provision, the discharge of wastewater into navigable waters would be "disposal" of solid waste, and potentially subject to regulation under both the Clean Water Act and RCRA....

*Id.* at \*1–2.

In *Lutz v. Chromatex. Inc.*, 725 F.Supp. 258 (M.D.Pa.1989), the court found that discharges of chemicals to sewers, drains, and trenches were not subject to RCRA's industrial wastewater exclusion. Relying on the holding in *Allegan Metal,* the court found that the discharges were regulable under RCRA because they were not made "pursuant to and authorized by a permit" under the CWA. *Id.* at 263. The court noted that the holding in *Allegan Metal* "apparently was based in part on a misreading of the regulations dealing with the solid waste 'point source' exclusion. Nevertheless, its conclusion is clearly supported by the plain language of [the exclusion]." *Id.* at 263 n. 1 (citing 42 U.S.C. § 6903(27) and 40 C.F.R. § 261.4(a)(2), comment).

More recently, the court in *Williams Pipe Line Company v. Bayer Corp.*, 964 F.Supp. 1300 (S.D.Iowa 1997), interpreted the industrial wastewater exclusion to encompass spills onto the ground from above-ground storage tanks of wastewater containing petroleum hydrocarbons. According to the court, the purpose of the exclusion, " 'is to avoid duplicative regulation, not to create a regulatory hole through which billions of gallons of hazardous wastes can be pumped into the earth without any controls.' " *Id.* at 1328 (quoting *Inland Steel Company v. Environmental Protection Agency*, 901 F.2d 1419, 1423 (7th Cir.1990)). Since the spills were from a point source and were subject to regulation under the Pollutant Discharge Elimination System established by the CWA,

they were excluded from regulation under RCRA. *Id.* at 1328–29.

Giving deference to the EPA's interpretation, I find that RCRA's industrial wastewater exclusion applies to the "unauthorized discharges of pollutants in violation of the Clean Water Act" alleged in Claim Two of the complaint. *See Inland Steel Company v. Environmental Protection Agency*, 901 F.2d 1419, 1424 (7th Cir. 1990) (unless statutory language compels otherwise, EPA's interpretation entitled to "some, perhaps considerable, deference") (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Those discharges are "point source discharges subject to permit" under the CWA, whether or not they are within effluent levels set in the permit. To hold otherwise would subject the discharges to duplicative regulation under both the CWA and RCRA.

Accordingly, summary judgment in favor of defendant is appropriate dismissing Claim Two.

### C. Claims Three–Six, Eight & Nine: "Discharged Acidic Water."

■ Defendant contends that plaintiff's third, fourth, fifth, sixth, eighth and ninth claims, which seek injunctive relief and civil penalties under RCRA for defendant's alleged spilling of acidic materials onto the grounds of the facility and discharges of acidic water, should likewise be dismissed based on the "industrial wastewater exclusion" of 42 U.S.C. § 6903(27) and 40 C.F.R. § 261.4(a)(2). However, as discussed in Part I(B) above, and as set forth in the comment to the explanatory regulations, "[t]he exclusion applies only to the actual point source discharge." The OSWER Directive cited above explains this distinction as follows:

[The exclusion does] not apply to industrial wastewaters prior to discharge since most of the environmental hazards posed by wastewaters in treatment and

holding facilities—primarily groundwater contamination—cannot be controlled under the Clean Water Act or other EPA statutes. Thus, EPA based this exclusion on the need to avoid duplicative regulation under two statutes for discharges that occur at the end-of-the-pipe (*i.e.*, discharges directly to surface water). EPA did not intend that the exclusion cover groundwater discharges from treatment processes that occur prior to the "end-of-the-pipe" discharge.... Therefore, wastewater releases to groundwater from treatment and holding facilities do not come within the meaning of the RCRA exclusion in 40 C.F.R. § 261.4(a)(2), but rather remain within the jurisdiction of RCRA.

1995 WL 911821 (OSWER), at *2.

In Claims Three, Four, Five and Six, plaintiff alleges that defendant not only "discharged acidic water" but also "spilled acidic materials onto the grounds of the facility...." In Claim Eight, plaintiff characterizes the spills and discharges as "solid waste disposal activities." Claim Nine seeks relief based on defendants' alleged "spilling, leaking, releasing, discharging and disposing discarded and abandoned highly acidic materials...." In each of these claims, the activity complained of ostensibly occurred prior to the "end-of-the-pipe" discharge, and is alleged to have contaminated the "groundwater in the uppermost aquifer" underlying the facility (Item 1, ¶ 26).

Accordingly, defendant has failed to show that, as a matter of law, the conduct alleged in Claims Three, Four, Five, Six, Eight and Nine of the complaint is excluded from RCRA regulation under the industrial wastewater discharge exclusion.

█ Defendant also argues that, because the alleged discharges of acidic wa-

ter fell below a pH of 2.0 on only four occasions out of a total of fifty-one samples taken over the course of six years, the discharges cannot constitute "hazardous waste" under federal regulations. Defendant cites 40 C.F.R. § 261.22(a)(1), which provides:

> A solid waste exhibits the characteristic of corrosivity if a representative sample of the waste ... is aqueous and has a pH less than or equal to 2 or greater than or equal to 12.5....

According to defendant, four out of fifty-one samples over six years is not "representative" within the meaning of the regulation, and therefore none of the discharges constitute hazardous waste under RCRA.

Defendant cites to no statutory, regulatory or caselaw authority in support of this argument. On the other hand, plaintiff cites *United States v. Conservation Chemical Co. of Illinois*, 733 F.Supp. 1215, 1225 (N.D.Ind.1989) which held that where a surface impoundment contained aqueous waste with a pH below 2 on at least one occasion, that waste could be characterized as "hazardous" despite circumstantial evidence tending to show that the pH could not have been consistently low over a period of several years.

Based on this record, therefore, I find that defendant is not entitled to summary judgment dismissing Claims Three, Four, Five Six, Eight and Nine.

### D. Claim Seven: Interim Status Standards.

Defendant contends that plaintiff's seventh claim, which alleges violations of the "Interim Status" standards[2] for closure, post-closure and groundwater monitoring

---

2. The federal "Interim Status" standards, set forth at length at 40 C.F.R. Part 265, "establish minimum national standards that define the acceptable management of hazardous waste during the period of interim status and until certification of final closure or, if the facility is subject to post-closure requirements, until post-closure responsibilities are fulfilled." 40 C.F.R. § 255.1(a). In addition, New York State has established statewide "Interim Status" standards, set forth at length at 6 N.Y.C.R.R. Part 373–3.

with respect to surface impoundments,[3] should be dismissed for the following reasons:

1. The claim is time barred to the extent it seeks relief based on events that occurred more than five years prior to the filing of the complaint in this case;

2. Defendant was informed in 1983 by the EPA that it could submit a closure plan for the surface impoundments in lieu of compliance with the Interim Status standards;

3. Defendant closed the impoundments and removed all wastes prior to the effective date of the Interim Status standards; and

4. The New York State Department of Environmental Conservation ("NYS-DEC") notified defendant that it was in compliance with state hazardous waste regulations.

Each of these contentions is addressed in turn.

### 1. Statute of Limitations.

In its seventh claim, plaintiff alleges that from the time defendant purchased the facility in October, 1981, until August, 1984, defendant collected highly acidic wastes in surface impoundments without a permit. Defendant contends that these activities are beyond the five-year statute of limitations. However, as explained in *United States v. Conservation Chemical Co. of Illinois, supra:*

> Even where only prospective application of the statute is contemplated, ... current or continuing violations may be addressed despite the fact that they may have originated in activities occurring before the effective date of the statute. Thus, although the actual disposal of

hazardous waste into a land disposal unit is not a violation of RCRA if the disposal occurred before the material was established by regulation to be a hazardous waste, the current storage of that hazardous waste in the land disposal unit may subject the owner or operator of the facility to RCRA liability if the storage is carried out in violation of one or more of the RCRA regulations.

733 F.Supp. at 1223 (citations omitted); *see also City of Toledo v. Beazer Materials and Services, Inc.*, 833 F.Supp. 646, 656 (N.D.Ohio 1993) (disposal of wastes in the past can constitute continuing violation as long as no proper disposal procedures are put into effect or as long as waste has not been cleaned up and environmental effects remain remediable).

In this case, plaintiff alleges unpermitted waste activities during the 1981–84 time period which had not been addressed, as required by federal and state regulations for groundwater monitoring, closure and post-closure of hazardous waste treatment and storage facilities, prior to the filing of the complaint in this case. These allegations state a claim for continuing violations of RCRA and implementing regulations. Claim Seven is therefore not barred by the statute of limitations.

### 2. 1983 Letter from EPA.

Defendant contends that plaintiff's seventh claim should be dismissed because, as confirmed in a letter dated July 1, 1993 from the EPA, defendant "would no longer require a RCRA permit or be subject to interim status standards after closure" of the two surface impoundments at the facility (Item 8, Ex. 4). However, the letter also states that, "as of this date, EPA has received neither a closure plan nor a

---

**3.** "Surface impoundment" is defined in the federal regulations as follows:

> Surface impoundment means a waste management unit which is a natural topographic depression, man-made excavation, or diked area formed primarily of earthen materials (although it may be lined with man-

> made materials), which is designed to hold an accumulation of liquid wastes or waste containing free liquids, and which is not an injection well. Examples of surface impoundments are holding, storage, settling, and aeration pits, ponds, and lagoons.

40 C.F.R. § 61.341.

RCRA permit application from PVS Chemicals" (*id.*).

Accordingly, plaintiff's seventh claim cannot be dismissed based on the statements contained in the July 1, 1983 letter.

### 3. Closure.

■ Defendant also contends that, after it received the July 1, 1983 letter from the EPA, it submitted a plan for closure of the two surface impoundments and, by September of 1984 (prior to the July 14, 1985 effective date of the state "Interim Status" standards), had completed the closure and removal of the acidic materials from the two surface impoundments at the facility (*see* Item 8, Ex. 6; *see also* Item 15, Ex. O). However, as detailed in the affidavit of Abby M. Snyder, Regional Attorney for NYSDEC Region 9, and as evidenced by the information contained in the extensive correspondence and other documents attached as exhibits thereto, defendant's closure of the surface impoundments has not been approved by either the EPA or the NYSDEC, due to "numerous deficiencies ... regarding surface impoundment construction, utilization, closure process, disposal of waste and residual materials, ... re-establishment of grades [and] groundwater assessment requirements" (Item 15, ¶ 24 & Exs. R, S, V, Z, EE, FF, HH).

Accordingly, genuine issues of fact remain as to whether defendant "has failed to comply with the closure, post-closure and groundwater monitoring interim status standards applicable to the facility by virtue of its hazardous waste activities," as alleged in plaintiff's seventh claim for relief (Item 1, ¶ 72).

### 4. Notification of Compliance from NYSDEC.

Defendant also contends that plaintiff's seventh claim should be dismissed because defendant was notified in a letter dated January 16, 1985 from NYSDEC that, as determined from an inspection of the facility in August, 1984, the facility "is in compliance with the NYS Hazardous Waste Regulations" (Item 8, Ex. 7). However, the January 16, 1985 letter further stated that the August, 1984 inspection "did not address the issue of closure and groundwater monitoring" (*id.*).

Defendant also refers to an inspection report dated November 4, 1987, which stated that the facility "was not subject to the New York State Hazardous Waste Regulations" (*id.*, Ex. 8). The report noted that defendant "is under consent order to close lagoon (filled in) and complete wells for [groundwater monitoring]" (*id.*, p. 1–3). As discussed above, the affidavits and exhibits show that triable issues of fact remain as to whether defendant has complied with the regulatory requirements for closure and groundwater monitoring.

Accordingly, defendant has failed to establish that it is entitled to summary judgment dismissing plaintiff's seventh claim.

### E. Claim Ten: ECL § 17–0501.

■ Defendant contends that plaintiff's tenth claim, brought under § 17–0501 of the New York Environmental Conservation Law,[4] is barred by the Second Cir-

---

4. N.Y. ECL § 17–0501 provides:
   It shall be unlawful for any person, directly or indirectly, to throw, drain, run or otherwise discharge into [state] waters organic or inorganic matter that shall cause or contribute to a condition in contravention of the standards adopted by the department pursuant to section 17–0301.
   Section 17–0301 establishes standards of quality and purity for various classifications of state waters, "prescrib[ing] what qualities and properties of water shall indicate a polluted condition of the waters of the state which is actually or potentially deleterious, harmful, detrimental or injurious to the public health, safety or welfare, to terrestrial or aquatic life or the growth and propagation thereof, or to the use of such waters for domestic, commercial, industrial, agricultural, recreational or other reasonable purposes...." N.Y. ECL § 17–0301(4). Plaintiff alleges in Claim Ten that defendant's discharge of acidic materials has caused groundwater contamination in contravention of the pH standards set forth at 6 N.Y.C.R.R. § 703.5.

cuit's decision in *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Company*, 12 F.3d 353 (2d Cir.1993). In *Atlantic States*, the Second Circuit held that state regulations, including the provisions of SPDES permits, are not enforceable through a citizen suit under the Clean Water Act where the state regulatory scheme mandates "a greater scope of coverage than that required" by the federal scheme. *Id.* at 358–59. According to defendant, since the state regulation sought to be enforced in Claim Ten pertains to groundwater contamination, it is beyond the scope of the CWA and is therefore unenforceable in this citizen suit. *See, e.g., Kelley for and on Behalf of the People of the State of Michigan v. United States*, 618 F.Supp. 1103, 1106 (W.D.Mich.1985) ("Congress did not intend the Clean Water Act to extend federal regulatory and enforcement authority over groundwater contamination. Rather, such authority was to be left to the states.").

I do not find plaintiff's tenth claim foreclosed by the holding in *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Company*. For one thing, in this case plaintiff invokes the citizen suit provisions of not only the CWA but also RCRA which, as discussed above, the EPA has interpreted to encompass regulation of groundwater contamination resulting from wastewater discharges at treatment and holding facilities. *See* OSWER Directive, *supra*, 1995 WL 911821 (OSWER), at *2. *Atlantic States* specifically held that a citizen suit cannot be maintained under the CWA to enforce New York's wastewater effluent standards incorporated into a SPDES permit because those standards are broader in scope than the regulatory scheme contemplated by the CWA. *Atlantic States* did not address the question whether New York's regulatory standard for the pH level of groundwater can be enforced in a citizen suit brought under RCRA.

In addition, as plaintiff points out, the state law claims in this case are brought under the federal supplemental jurisdiction statute. That statute provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy....

28 U.S.C. § 1367. The federal courts have consistently held that, where state law claims arise out of the same set of operative facts as federal claims brought under environmental statutes and involving the same contaminated property, the court also has discretionary power under the supplemental jurisdiction statute to hear the state claims. *See, e.g., White v. County of Newberry*, 985 F.2d 168, 171–72 (4th Cir.1993) (in CERCLA action, court exercised supplemental jurisdiction over state law claim for inverse condemnation); *Stoddard v. Western Carolina Regional Sewer Authority*, 784 F.2d 1200 (4th Cir.1986) (finding nothing in Clean Water Act indicating congressional intent to occupy entire field of water pollution to the exclusion of state regulation); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1050 (2d Cir. 1985) (public nuisance claim and CERCLA claim deriving from common nucleus of fact should be tried in same proceeding; irrelevant that scope of relief under state law differs from relief under federal law); *Raytheon Co. v. McGraw–Edison Co., Inc.*, 979 F.Supp. 858 (E.D.Wis.1997) (in action brought under CERCLA and RCRA, court exercised supplemental jurisdiction over eleven state law claims, including nuisance Claim); *Albahary v. City and Town of Bristol, Connecticut*, 963 F.Supp. 150 (D.Conn.1997) (in citizen suit brought under RCRA and CWA alleging groundwater contamination, court exercised supplemental jurisdiction over several state law claims, including nuisance claim).

Accordingly, I find that defendant is not entitled to summary judgment dismissing plaintiff's tenth claim for relief.

### F. Claim Eleven: ECL § 17–0807(4).

Defendant contends that plaintiff's eleventh claim merely reiterates the CWA claim set forth in Claim One. According to defendant, because Claim One should be dismissed, claim eleven should also be dismissed. However, as discussed above, plaintiff has stated a viable claim for injunctive relief and statutory civil penalties for the alleged SPDES permit violations occurring after May 24, 1992.

Accordingly, defendant is not entitled to summary judgment dismissing plaintiff's eleventh claim for relief.

### G. Claim Twelve: Release of Sulfur Dioxide Gas.

Defendant contends that plaintiff's twelfth claim for relief, brought under 6 N.Y.C.R.R. § 211.2,[5] should be dismissed because it alleges a single release of sulfur dioxide gas and therefore fails to state an ongoing violation of the Clean Air Act. Defendant also contends that 6 N.Y.C.R.R. § 211.2 is a non-objective standard and, as such, not enforceable in a citizen suit. *See Satterfield v. J.M. Huber Corp.*, 888 F.Supp. 1561 (N.D.Ga.1994) (citizens cannot sue for alleged violations of non-objective air quality standard under Clean Air Act).

However, plaintiff's twelfth claim does not seek Clean Air Act relief, but instead is brought as a state law claim under this court's supplemental jurisdiction. Although this court may decline to exercise supplemental jurisdiction over a state law claim which "raises a novel or complex issue of State law" or "substantially pre-

dominates over the claim or claims over which the district court has original jurisdiction," 28 U.S.C. § 1367(c)(1), (2), I do not find those circumstances present in this case. Rather, the conduct alleged in Claim Twelve—release of sulfur dioxide gas into the atmosphere—is sufficiently related to the other claims in the complaint pertaining to defendant's operation of its chemical manufacturing facility "such that [plaintiff] would ordinarily be expected to try them all in one judicial proceeding. . . ." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), *quoted in Promisel v. First American Artificial Flowers*, 943 F.2d 251, 254 (2d Cir.1991).

Accordingly, I find that defendant is not entitled to summary judgment dismissing Claim Twelve.

### H. Claim Thirteen: Public Nuisance.

Defendant contends that plaintiff's state law public nuisance claim is improper in a federal citizen suit under the CWA or RCRA, and because it rests on a non-objective standard. This contention is rejected for the same reasons as stated above—the court has found no compelling reasons why it should decline to exercise supplemental jurisdiction over plaintiff's state law claims.

For all of these reasons, it is recommended that defendant's motion for summary judgment be granted to the extent that it seeks dismissal of plaintiff's claims for statutory civil penalties based on SPDES permit violations occurring prior to May 24, 1992, and to the extent it seeks dismissal of Claim Two. The motion should be denied in all other respects.

---

**5.** 6 N.Y.C.R.R. § 211.2 provides:

No person shall cause or allow emissions of air contaminants to the outdoor atmosphere of such quantity, characteristic or duration which are injurious to human, plant or animal life or to property, or which unreasonably interfere with the comfortable enjoyment of life or property. Notwithstanding the existence of specific air quality standards or emission limits, this prohibition applies, but is not limited to, any particulate, fume, gas, mist, odor, smoke, vapor, pollen, toxic or deleterious emission, either alone or in combination with others.

## II. Motion for Protective Order.

Defendant seeks a protective order pursuant to Fed.R.Civ.P. 26(c) staying discovery pending determination of its summary judgment motion. The court has already entered an order based on the parties' stipulation to an extension of the dates set in the initial scheduling order in this case (Item 20). Accordingly, defendant's motion for a protective order is denied.

## III. Plaintiff's Motion for Leave to Amend the Complaint.

Plaintiff seeks to add two new state law claims against defendant based on a November 3, 1997 inspection of the PVS facility (conducted after the filing of the original complaint in this action) which revealed that defendant has redirected the flow of its discharge and has begun construction and operation of a disposal system without NYSDEC approval. Because I find that these claims are "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy ...," 28 U.S.C. § 1367(a), and because leave to amend "shall be freely given when justice so requires ...," Fed.R.Civ.P. 15(a), plaintiff's motion is granted.

### CONCLUSION

For the foregoing reasons, it is recommended that defendant's motion (**Item 8**) be granted to the extent that it seeks to limit plaintiff's claims for statutory civil penalties to the alleged SPDES permit violations occurring after May 24, 1992, and to the extent it seeks dismissal of Claim Two. The motion should be denied in all other respects.

It is ORDERED that defendant's motion for a protective order (**Item 8**) is denied.

It is further ORDERED that plaintiff's motion for leave to amend the pleadings (**Item 12**) is granted. Plaintiff shall file its amended complaint with the Clerk of the Court on or before **July 20, 1998**. Defendant shall plead in response in accordance with Fed.R.Civ.P. 15(a) and any other applicable federal and local rules of civil procedure.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3). The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.*** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." ***Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.***

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**SO ORDERED.**