**UNITED STATES of America, Plaintiff,**

v.

**WCI STEEL, INC., Defendant.**

No. 4:98–CV–1082.

United States District Court, N.D. Ohio, Eastern Division.

Oct. 22, 1999.

Arthur I. Harris, Office of the U.S. Attorney, Cleveland, OH, Francis J. Biros, Department of Justice, Environmental Enforcement Section, Washington, DC, Lois J. Schiffer, Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC, Frank Bentkover, Drenaye Houston, Matthew A. Fogelson, Department of Justice, Environmental Enforcement Section, Washington, DC, for United States of America, plaintiff.

Van Carson, Lisa R. Duffett, Ellen Seibenschuh, Lisa D. Sutton, Squire, Sanders & Dempsey, Cleveland, OH, Vincent Atriano, Squire, Sanders & Dempsey, Columbus, OH, for WCI Steel, Inc., defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GWIN, District Judge.

In this action, the Plaintiff United States alleges that three wastewater ponds at

Defendant WCI Steel's Warren, Ohio steelmaking facility (Ponds 5, 6, and 6A) are hazardous waste units, and as such are subject to regulation under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* As grounds for this allegation, the United States claims that Ponds 5, 6, and 6A once contained wastewater having a pH[1] of 2.0 standard units ("s.u.") or lower, and thus had a corrosive characteristic.[2]

Plaintiff United States filed this action on May 11, 1998. To establish WCI's use of corrosive substances, the United States principally relies upon sampling it did in May and June 1993 and upon data supplied by WCI in early 1994.

The parties having waived a jury, this matter went to trial before this Court. After observing the demeanor of the witnesses and considering the parties' evidence and arguments, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. History of WCI Steel

The Defendant WCI Steel, Inc. ("WCI") is an Ohio corporation with its principal place of business at 1040 Pine Avenue, Warren, Ohio.[3] At this facility, Defendant WCI operates the last remaining integrated steel mill in the Mahoning River Valley.

WCI Warren facility manufactures hot rolled strip steel, pickled and oiled hot rolled steel strip, cold rolled steel, and coated flat steel products. Employing approximately 2,200 employees, WCI is the largest steel employer in the Mahoning Valley.

Steel production began at the Warren facility in 1912. Beginning in the 1930s, Republic Steel Corporation owned the facility. In 1984, Republic Steel Corporation merged with J & L Steel Corporation to form LTV Steel Company. In 1988, LTV Steel Company went into bankruptcy. With little potential to operate profitably, the bankruptcy trustee decided to sell the Warren facility to Defendant WCI for an insignificant price compared with the facility's physical assets.[4]

In August 1988, Defendant WCI purchased the Warren facility during a time of major decline in United States integrated steelmaking production.[5] By saving the facility from shutdown, WCI greatly benefitted its workers and the Warren, Ohio, community.

After purchasing the Warren facility, Defendant WCI made major investments in production equipment and facilities. WCI spent more than $300 million on capital improvements. These capital expenditures also reduced the amounts of pollution.

---

1. The measure of pH provides an estimate of the acidic agent (hydrogen ion) and the basic agent (hydroxide ion).

2. The United States' complaint alleges, in part:

 24. One or more of the surface impoundments at the facility, including Ponds 5, 6 and 6A, have contained wastewaters which exhibited a pH of 2 or less during the time period relevant to this Complaint.
 25. Wastewaters flowing into, contained in, or flowing out of Ponds 5, 6 and 6A have exhibited the characteristic of corrosivity and are a hazardous waste within the meaning of 40 C.F.R. § 261.20 and 261.22.
 26. Ponds 5, 6 and 6A at the facility are hazardous waste management units as defined by 40 C.F.R. § 260.10, and O.A.C.

§ 3747–50–10(A)(49) and are subject to regulation as hazardous waste management units subject to the provisions of RCRA and the O.A.C.
Complaint, ¶¶ 24–26.

3. All of the United States' claims relate to WCI's Warren facility.

4. On August 31, 1988, Warren Consolidated Industries, Inc., acquired the facility from LTV Steel Company. In December 1991, Warren Consolidated Industries, Inc. changed its corporate name to WCI Steel, Inc.

5. Product had declined by nearly 50% in a decade. The year WCI purchased the Warren facility marked the seventh consecutive year of loss for the steel industry.

## B. Wastewater System

At its Warren Ohio, facility, WCI has a system for the collection and treatment of wastewater generated in its steel production. The WCI steel facility first collects wastewater from manufacturing areas. This wastewater is then distributed to Pond 5 through a system of underground sewers, pumps, and pipes.

After settling and oil separation processes take place in Pond 5, WCI conveys the wastewater to Pond 6. From Pond 6, WCI pumps the wastewater across the Mahoning River to a central treatment plant.

In 1986, LTV installed Pond 6A to intercept and collect seepage from Pond 6 before it reached the Mahoning River. The seepage collected in Pond 6A is pumped back into Pond 6.

WCI primarily intends the pond system to equalize flow to the central treatment plant, to give storm water surge protection, and to allow the skimming of a substantial portion of oil from the wastewater. Taken together, the areal extent of the Ponds is slightly more than one acre.

This wastewater treatment system was constructed before WCI purchased the Warren facility in 1988. Ponds 5 and 6 have been in use at the Defendant's facility since before 1950. Pond 6A was added in 1986. Ponds 5, 6, and 6A have been in continuous use to the current date.

Ponds 5, 6, and 6A are each unlined earthen surface impoundments.[6] At relevant times, these surface impoundments were not equipped with impermeable liners.

Spent pickle liquor is listed by U.S. EPA as a corrosive and toxic hazardous waste under RCRA regulations at 40 C.F.R. § 261.32. However, if the acid was neutralized by the addition of lime, then the pickle liquor would be exempt from RCRA's hazardous waste regulations under the iron and steel industry exemption in 40 C.F.R. § 261.3(c)(2)(ii)(A).[7]

By its nature, the steel industry often uses corrosive materials. WCI uses spent hydrochloric pickling acids, acidic rinse waters, and acidic fume scrubber wastewaters. Occasionally, WCI would inadvertently release quantities of these substances. When such spills occurred, they more often occurred near the picklers than anywhere else. The picklers provided secondary containment for the acid tubs, designed to retain acid leaks or spills. WCI experienced leaks from the acid tubs on an infrequent basis. When such leaks occurred, WCI sought to isolate and neutralize the spilled acid, or "pickle liquor."

Before 1993, WCI used a procedure of manually adding lime to the wastewaters when the wastewater pH fell to between 3 and 4 s.u. as measured by the influent probe at the central treatment plant. Under this procedure, employees would add a certain number of 50–pound bags of lime to the wastewater. As to this decision, Environmental Engineer Richard Gradishar usually decided how many bags to add based upon the pH of the wastewater. However, WCI did not conduct any testing to learn whether the lime succeeded in neutralizing the acid.

---

6. 40 C.F.R. § 260.10, defines a "surface impoundment" as:

 a facility or part of a facility which is a natural topographic depression, man-made excavation, or diked area formed primarily of earthen materials (although it may be lined with man-made materials), which is designed to hold an accumulation of liquid wastes of wastes containing free liquids, and which is not an injection well. Examples of surface impoundments are holding, storage, settling, and aeration pits, ponds and lagoons.

7. 40 C.F.R. § 261.3(c)(2)(ii) provides, in part:

 (ii) The following solid wastes are not hazardous even though they are generated from the treatment, storage, or disposal of a hazardous waste, unless they exhibit one or more of the characteristics of hazardous waste:
 (A) Waste pickle liquor sludge generated by lime stabilization of spent pickle liquor from the iron and steel industry (SIC Codes 331 and 332).

In the early 1990s, WCI considered replacing Ponds 5, 6, and 6A with a second-hand four million gallon above-ground tank. WCI obtained a permit from the EPA to install the tank. After obtaining this permit, WCI discovered that the tank was no longer in usable condition. Defendant WCI therefore did not complete the project.

C. History of Environmental Review

With this action, the Plaintiff United States alleges that WCI was subject to RCRA because it dealt with hazardous substances without a permit. Defendant WCI does not have a permit issued pursuant to 42 U.S.C. §§ 6925 and 6926 to manage, treat, or store hazardous wastes in Ponds 5, 6, and 6A. Nor does WCI qualify for interim status under § 6925, which would temporarily exempt WCI from the permit requirement.[8]

Shortly after purchasing the WCI facility in 1988, Defendant WCI applied for a National Pollutant Discharge Elimination System Permit. After approving this application, the Ohio EPA allowed WCI to use Ponds 5, 6, and 6A as sedimentation units under the Clean Water Act. However, the permit did not authorize WCI to treat, store, or dispose of hazardous wastes in Ponds 5, 6, or 6A.

Defendant WCI next applied for and received an EPA Part B permit, authorizing the storage of spent pickle liquor processed through tanks. The EPA Part B permit required WCI to manage hazardous waste only according to the permit's provisions. The Part B permit forbade any management of hazardous waste not authorized by the permit or otherwise exempted by law. In particular, the Part B permit did not authorize WCI to treat, store or dispose of spent pickle liquor or corrosive characteristic wastes in Ponds 5, 6, or 6A.

As part of its Part B permit, Defendant WCI installed groundwater monitoring wells near Ponds 5, 6, and 6A in April 1998. The results from these wells do not indicate that the Ponds adversely affect the groundwater.

Within Ohio, the Ohio EPA administers the RCRA hazardous waste management program as the U.S. EPA's delegee under authorization by the U.S. EPA.[9] As the U.S. EPA's authorized delegee, the Ohio EPA had authority to inspect WCI's facility and to decide whether WCI met the standards of RCRA and analogous Ohio law.

Since 1981, the Ohio EPA has conducted at least twelve hazardous waste compliance inspections of the facility. In conducting these inspections, the Ohio EPA had access to all WCI facilities. At the time of the inspections, WCI told the Ohio EPA that these surface impoundments were used as solid waste management units for waste waters from the cold rolling, coated products, and pickling operations.[10] After conducting these reviews, the Ohio EPA has never alleged or determined that the Ponds were hazardous waste units under RCRA.

II. Sampling

A. Consultant Sampling

As indicated, the Plaintiff United States alleges that WCI handled corrosive wastes that were hazardous. Because it has scant sampling data of its own, the United States

8. In order to qualify for such interim status, a facility had to demonstrate that: 1) it was in existence on November 19, 1980; 2) it had complied with Section 3010(a) of RCRA concerning notification of hazardous waste activity; and 3) it had made an application for a permit, Section 3005(e) of RCRA, 42 U.S.C. § 6925(e). Here, WCI neither provided notice of its hazardous waste activity nor made an application for a permit.

9. On June 30, 1989, the Ohio EPA was granted final authorization to administer and enforce the RCRA program as the U.S. EPA's authorized delegee pursuant to Section 3006 of RCRA.

10. Testimony of Ohio EPA employee Kristen Switzer at 27–28.

relies upon studies undertaken by others at various times.

Defendant WCI employed engineers who took samples on at least two occasions. On June 20, 1989, Duncan, Lagnese & Associates conducted hourly sampling of the wastewater in the surface impoundments.[11] Of twenty-four grab samples collected by these engineers, twenty-one had a pH value of 2.0 s.u. or below. These samples were not taken as part of a sampling plan of the whole ponds.

In 1990, WCI's contractor, Remcor, Inc., sampled the sludges in Ponds 5 and 6 following a formal sampling plan. After conducting this sampling, Remcor found the sludges were not corrosive or hazardous.

In October 1993, engineers Killam Associates conducted a study for WCI. While doing this study, Killam collected three grab samples from the bosh box that channels wastewater to the surface impoundments. The three samples collected by Killam had pH values of 1.3, 1.7 and 2.0 s.u., respectively. After completing this sampling of the bosh box, Killam Associates gave the opinion that the pH of the wastewater in the surface impoundments was between 1.9 and 2.0 s.u. These Killam Associates samples were not taken as part of a sampling plan that sought to find the average properties of the whole ponds.

### B. 1993 U.S. EPA Multimedia Inspection

Beginning on May 12, 1993, the U.S. EPA conducted a "multimedia" inspection of WCI's facility under the Clean Water Act, the Clean Air Act, RCRA, and the Toxic Substances Control Act. During this inspection, the U.S. EPA collected a grab sample of wastewater being pumped from Pond 6A to Pond 6. U.S. EPA took the sample from the flow of the wastewater as it entered Pond 6. The field measurements of this sample revealed a pH of 1.81 s.u., below the regulatory limit of 2.0 s.u.

On June 15, 1993, the U.S. EPA inspectors returned and took another grab sample of water from Pond 6A. The sample's pH was above 2.0 s.u.

During this June 1993 inspection, the U.S. EPA also collected a sample of wastewater from a process that uses acid pickle liquor to treat steel. The U.S. EPA field measurements of this sample showed a pH of 1.65 s.u. The U.S. EPA also collected a grab sample from wastewater flowing from Pond 6 at the point where it commingles with wastewater from the Basic Oxygen Furnace. The field measurements of the sample showed a pH of 1.67 s.u.

### C. Central Treatment Plant Aeration Influent Probe

WCI's wastewaters are pumped from Pond 6 to an inlet box outside the central treatment plant. In support of its claim that WCI's wastewater was corrosive, the United States principally relies upon WCI's own pH readings taken at the influent probe outside the central treatment plant.

While EPA regulations did not require WCI to monitor the pH at the central treatment plant, it nonetheless did so. To treat its wastewater, WCI has measured the pH of the wastewater as it flows through the central treatment plant. At this point, the influent box receives wastewater from Pond 6 and other process sources.

To make these measurements, WCI uses several pH probes that continuously monitor the pH of the wastewater as it flows through the central treatment plant. WCI put one inflow pH probe at the aeration influent box.

The pH meter at the aeration influent box measures the pH of the wastewater as it flows from Pond 6 into the central treatment plant. WCI submerges this probe in the flow of the wastewater as it enters the aeration influent box.[12]

11. One sample was gathered every hour for twenty-four hours.

12. The pH meter used by WCI to measure the pH of Pond 6 influent wastewater is a glass

At least once a week, WCI Combustion Department personnel calibrate the pH meter used to measure the pH of Pond 6 influent wastewater. Defendant WCI argues that the method used to calibrate this probe resulted in inaccurate.

EPA guidelines recommend a two-standard calibration technique to calibrate pH meters. To calibrate the probe, the Combustion Department personnel use two buffer solutions with specified pH. Typically, they use buffer solutions with pH of 2.0 and 4.0. In contrast, pH calibration is better done using a neutral buffer solution of 7.0 with a second solution with pH of either 4.0 or 10.0. It is unlikely that the maintenance crew could achieve completely accurate probe calibrations using the buffer solutions with pH of 2.0 and 4.0.

Amounts of oil and grease were usually in the wastewater influent as it enters the central treatment plant. The oil and grease can quickly coat a pH probe, rendering its readings less accurate. Oil and grease can foul a probe if they are present in sufficient concentration.

Because of the presence of oil and grease in the wastewater flowing into the central treatment plant, plant operators cleaned the influent pH probe by removing the submerged probe from the flow of the wastewater and dipping the probe in acid. The operators cleaned the influent pH probe in an acid solution once per shift, or three times per day. Though a brief exposure to an acid solution can effectively clean mineral deposits from a pH electrode, it is not an effective cleaning agent for oil and grease deposits. These problems make the influent probe readings less accurate.

Defendant WCI recorded the readings from the pH meters at the aeration in-

fluent box every two hours from September 1, 1988 to February 22, 1995, and every hour from February 23, 1995 to July 31, 1998.

Between September 1, 1988 and July 31, 1998, WCI's central treatment plant operators recorded more than 11,000 pH values of 2.0 s.u. or less for Pond 6 wastewater entering the central treatment plant. Such readings occurred on 1,361 different days. At least one reading of 1.7 s.u. or less occurred on 577 different days. Also, the central treatment plant operators recorded at least 31 pH measurements of 12.5 s.u. or above for Pond 6 wastewater entering the central treatment plant. Taken as a whole, these measurements did not significantly vary from 1989 to December 1993.

In December 1993, WCI installed an automated lime slurry injection system at the No. 9 Lift Station. For a period, this lime injection system reduced, but did not completely stop pH readings of 2.0 s.u. or less.[13] The system has now eliminated measurements with a pH of 2.0 s.u. or less at the influent probe to the central treatment plant.

### D. Grab Samples

Beyond measurements made with the influent probe, the central treatment plant operators also recorded grab sample pH measurements for Pond 6 wastewater as it entered the aeration influent box at the central treatment plant. WCI made 197 pH measurements via such grab samples. Operators took these samples by placing a laboratory beaker in the flow of the wastewater as it enters the aeration influent box. The central treatment plant operators then measure the pH of the grab samples with a bench meter in the central treat-

membrane electrode selective for hydrogen ion in combination with a pH meter. The pH meter used by WCI to measure Pond 6 influent pH is equipped with a microprocessor that handles the mathematics of the measurement. The pH meter used by WCI to measure the pH of Pond 6 influent wastewater displays the numerical pH value.

**13.** After installation of the lime injection system in December 1993, central treatment plant operators recorded an additional 358 measurements on 77 separate days of 2.0 s.u. or less for the wastewater in Pond 6 over the next two years.

ment plant office. The taking of grab samples is a method for checking the accuracy of in-line pH probes.

These grab samples showed pH readings of 2.0 s.u. or less on many occasions.

### E. Sludge Sampling

Several samples of sludge from Pond 6 were also tested for pH values. In October 1985, an LTV contractor tested 30 samples of sludge from Ponds 5 and 6 and found an average pH of the sludges to be 6.3, with all measurements falling within the range of 5.5 to 7.5.

In 1990, a WCI contractor sampled the sludges in Ponds 5 and 6 and found they were nonhazardous. And in 1996 and 1998, sampling performed by a WCI consultant again found the pH of the Ponds' sludges ranged between 5.4 s.u. and 10.9 s.u.

Thus, there is no evidence that any sludge from Ponds 5 or 6 was ever hazardous. Only wastewater measurements indicate potential corrosiveness.

Having set forth relevant findings of fact, the Court now offers its conclusions of law.

## III. CONCLUSIONS OF LAW

### A. Overview of RCRA

The Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA") was enacted in 1976 to regulate the treatment, storage, transportation, and disposal of hazardous wastes. RCRA seeks to ensure that such wastes are "managed in a manner which protects human health and the environment." 42 U.S.C. § 6902(a)(4) and (b). Subtitle C of RCRA establishes a comprehensive federal regulatory program for the management of hazardous waste. 42 U.S.C. §§ 6921–6939.

42 U.S.C. § 6925(a) prohibits the operation of any facility that treats, stores, or disposes of hazardous wastes, except in accordance with a permit. *United States v. Heuer*, 4 F.3d 723, 730 (9th Cir.1993) ("It is fundamental that an entity which performs a hazardous waste activity for which a permit is required under RCRA may not legally perform that activity unless it has a permit for the relevant activity."). Moreover, a party receiving a permit to store or dispose of hazardous waste must thereafter comply with the requirements of the permits.

If certain requirements are met, RCRA allows states to operate hazardous waste regulatory programs in lieu of the federal program. 42 U.S.C. § 6926(b). Even where a state is given authority to operate such a regulatory program, the United States retains the right to enforce the state authorized programs. 42 U.S.C. § 6928(a)(2). On June 30, 1989, the U.S. EPA granted final authorization to the State of Ohio to administer and enforce the State's hazardous waste program in the State of Ohio. 42 U.S.C. § 6926(b). The Ohio EPA administers the RCRA program within Ohio.

Under 42 U.S.C. § 6928(a), the United States may file a civil action in federal district court to obtain appropriate relief, including a temporary or permanent injunction upon obtaining information that any person has violated or is violating any requirement of RCRA. If a violation is shown, 42 U.S.C. § 6928(g) provides for a civil penalty in an amount not to exceed $27,500 per day of noncompliance for each violation.[14]

The Plaintiff United States has the burden to establish each of the elements of liability under RCRA. In showing liability, the applicable statute of limitations, 28 U.S.C. § 2462, stops any claim for penalty for a violation before May 11, 1993.[15]

---

**14.** 42 U.S.C. § 6928(g) provides for a civil penalty in an amount not to exceed $25,000 per day of noncompliance for each violation. This amount has been adjusted pursuant to

the U.S. EPA Civil Monetary Penalty Inflation Adjustment Rule, to $27,500 per day.

**15.** Pretrial Order, Uncontroverted Fact No. 3.

To establish a violation of RCRA, the United States must prove four general elements: (1) that WCI is a "person" within the meaning of RCRA; (2) that WCI's Warren, Ohio steel plant is a "facility" within the meaning of RCRA; (3) that WCI did not have a permit or interim status for the treatment, storage, or disposal of hazardous waste in the ponds; and (4) that WCI treated, stored, or disposed of hazardous waste in the ponds. *United States v. T. & S Brass & Bronze Works, Inc.*, 681 F.Supp. 314, 317 (D.S.C. 1988); *United States v. Conservation Chemical Co.*, 733 F.Supp. 1215, 1220 (N.D.Ind.1989).

Defendant WCI acknowledges that it is a "person" within the meaning of 42 U.S.C. § 6903(15) and that WCI's integrated steel plant, and all buildings, structures, and surface impoundments located there, comprise a "facility" within the meaning of 40 C.F.R. § 260.10. WCI also concedes it did not have a permit for the treatment, storage, or disposal of hazardous waste. WCI disputes only that it treated, stored or disposed of hazardous waste.

The Court now addresses the standards by which hazardous waste is identified. The Court then determines whether, upon applying these standards, WCI has violated RCRA.

### B. Standards for Determining "Hazardous Waste"

#### 1. Regulatory Classification and Corrosivity

RCRA controls the release of a "hazardous waste." If a substance exhibits certain characteristics, industrial wastewaters are subject to regulation under RCRA. *United States v. Dean*, 969 F.2d 187, 194 (6th Cir.1992).

42 U.S.C. § 6921 provides two ways in which a waste will be considered "hazardous." First, a waste will be classified as "hazardous" where the EPA has specifically listed the waste as hazardous. By regulation, the EPA has listed a number of wastes as hazardous. 40 C.F.R.

§§ 261.31–261.33 (1989). For example, spent pickle liquor, which the United States claims WCI discharged into Ponds 5, 6, and 6A, is a listed hazardous waste under 40 C.F.R. § 261.32.

The EPA will also classify a waste as "hazardous" if it has one or more of the characteristics of ignitability, corrosivity, reactivity, or toxicity. 40 C.F.R. §§ 261.21–.24. Here, the United States claims that WCI stored or disposed of corrosive waste.

Corrosiveness is the property that enables a substance to dissolve material with which it comes in contact. Improperly managed corrosive wastes can pose a substantial present or potential danger to human health and the environment.

As explained in further detail below, under 40 C.F.R. § 261.22 and O.A.C. § 3745–51–22, a waste is corrosive if it is aqueous and has a pH of 2.0 s.u. or less or greater than or equal to 12.5 s.u. Where a surface impoundment contains aqueous water with a pH of 2.0 s.u. or less, on at least one occasion, the water in the surface impoundment is hazardous waste. The United States here principally contends that substances in Ponds 5, 6, and 6A are corrosive, as having had pH of 2.0 s.u. or less.

As noted above, 42 U.S.C. § 6925(a) prohibits the operation of any facility that treats, stores, or disposes of hazardous wastes, except in accordance with a permit. *United States v. Heuer*, 4 F.3d 723, 730 (9th Cir.1993). Moreover, a party receiving a permit to store or dispose of hazardous waste must thereafter comply with the requirements of the permits.

If WCI treated, stored, or disposed of waste at the Warren facility, it was required under RCRA to have a permit to do so. It is undisputed that WCI had no permit to treat, store, or dispose of hazardous waste. Therefore, if the Court finds WCI maintained hazardous waste at its Warren facility, WCI has violated RCRA and is subject to fines under RCRA.

The parties offer differing views regarding how the Court should determine whether hazardous waste is treated, stored, or disposed of at WCI's Warren facility. Defendant WCI says the evidence offered by the United States is insufficient to support a finding that WCI maintains hazardous waste at the facility because the substances at the site were improperly sampled. The United States contends that even if the available samples do not conform to a specific methodology described in RCRA's regulations, the weight of evidence supports its contention that WCI treated, stored, or disposed of hazardous waste at the Warren facility.

The Court now examines whether RCRA's regulations require a particular sampling methodology.

### 2. Sampling Methodology

The United States claims WCI violated RCRA's prohibitions against hazardous waste by maintaining "corrosive" waste at the Warren facility. The regulations currently define "corrosivity" in the following way:

Sec. 261.22 Characteristic of corrosivity.

(a) A solid waste exhibits the characteristic of corrosivity if a *representative sample* of the waste has either of the following properties:

(1) It is *aqueous and has a pH less than or equal to 2* or greater than or equal to 12.5, as determined by a pH meter using Method 9040 in "Test Methods for Evaluating Solid Waste, Physical/Chemical Methods," EPA Publication SW–846, as incorporated by reference in Sec. 260.11 of this chapter.

40 C.F.R. § 261.22(a)(1) (emphasis added). Plaintiff United States asserts that WCI violated RCRA by maintaining wastewater with a pH of less than or equal to 2. Under the regulations, the United States must show such violation via a "representative sample" of the water.

RCRA regulations define "representative sample" as "a sample of a universe or whole (e.g., waste pile, lagoon, groundwater) which can be expected to exhibit the average properties of the universe or whole." 40 C.F.R. § 260.10. This definition has remained unchanged since originally promulgated by U.S. EPA in 1980. 45 Fed.Reg. 33066, 33075 (May 19, 1980).

This definition suggests that a finding of a RCRA violation must depend upon reliable and accurate sampling. WCI urges that the Court interpret the regulations to require a particular sampling method before results may be viewed as a reliable and accurate indication of corrosivity. WCI says that the sampling method used makes a difference because the Pond substances were heterogeneous.[16] Therefore, unless an appropriate sampling method is used, WCI says the results will not reflect "the average properties of the universe or

16. In an October 1985 study, the engineering firm Duncan, Lagnese & Associates sampled sludge from Ponds 5 and 6. It reported that the waste in the Ponds was heterogeneous, due to "considerable variation from point to point for all parameters measured." Exh. CJ.

Expert Charles Blumenscheim testified credibly on this issue:

Q. Do you know whether the waste material in the ponds at WCI is homogeneous or heterogeneous?

A. In my opinion it is not homogeneous its heterogeneous.

Q. And what's the basis for that opinion?

\* \* \* \* \* \*

A. These the water entering this pond 5, the way the pond is configured, this is a classic example of what we call plug-flow region. In the term of art. But what it means is that as the water enters the pond, it will move down the pond as a river would flow, if you can just visualize this as a river and any water entering here will move down this pond in segments. There is no mixers in this to make it homogeneous, and as the water enters this pond and then ultimately leaves the pond, enters the pipeline and enters this pond and again this water will move through this pond to these pumps and be pumped out and any water here again will enter this pond and be pumped to this pond so this is a classic example of a plug flow region.

whole." WCI says that the sampling presented here by the Plaintiff United States does not meet the requirements adopted in the EPA's own regulations.

In contrast, the United States first disputes that a sample needs to reflect the average properties of the whole.[17] Further, the United States argues that adoption of a sampling plan, and sampling in conformity with such a plan, is not a prerequisite to showing a violation of RCRA. The United States says that the failure to adopt a sampling plan and to comply with that plan goes to the weight of the evidence, rather than its admissibility.

Thus, the Court must first determine whether a sample needs to reflect the average properties of the whole. As to this issue, the United States' argument would turn the language of 40 C.F.R. § 261.22 and 40 C.F.R. § 260.10 on its head. 40 C.F.R. § 261.22 says corrosivity is determined based upon a "representative sample of the waste." 40 C.F.R. § 260.10 says the sample must reflect "the average properties of the universe or whole." In arguing that this Court disregard the ponds as a whole, the United States pushes aside its own regulations.

■ The Court therefore finds that the samples must be representative of the whole pond before a RCRA violation may be found. The key issue is what sampling method will produce a "representative sample" of the ponds and whether the methods used here produce a sufficiently reliable picture of the average properties of the ponds as a whole.

Defendant WCI argues that Plaintiff United States does not give evidence of representative samples because it failed to use the proper testing method found in Test Methods for Evaluating Solid Waste, Physical/Chemical Methods, EPA Publication SW–846 ("SW–846"). WCI says use of Method 9040, as specified in the Second Edition of SW–846, is required.

In contrast, the United States claims that samples not taken in conformity with Method 9040 can satisfy the requirement that samples exhibit the average properties of the universe or whole. First, the United States contests the applicability of Method 9040. The United States argues that before 1993, Method 5.2, as set forth in the First Edition of SW–846, was the method for deciding whether a waste was corrosive. Method 5.2's sampling requirements are less strict than the requirements suggested by Defendant WCI. Method 5.2 does not specify methods for determining the number of samples needed to obtain the average properties of the universe or whole. In contrast, Method 9040 does.

Alternatively, the United States says that SW–846 intends only to give guidance, not to mandate requirements. As a guidance document, the United States says SW–846 affords flexibility to use alternative test methods.

To decide this issue, the Court first considers the general applicability of Method 9040. During the relevant periods, RCRA regulations have always referenced certain test methods that are to be use to support a finding of "corrosivity," and, by extension, the presence of hazardous waste. 40 C.F.R. § 260.11 (citing test methods); 40 C.F.R. § 261.22(a)(1) (defining "corrosivity"). As the language of § 260.11 has altered over the years, the parties dispute which test method applied during the relevant period.

The United States argues that until August 31, 1993, 40 C.F.R. § 261.22(a)(1) required use of Method 5.2, as set forth in the First Edition of SW–846.[18] Specifically, until August 31, 1993, Section 261.22 provided, in pertinent part:

(a) A solid waste exhibits the characteristic of corrosivity if a representative

---

17. Plaintiff United States proposed conclusion of law No. 24b.

18. 40 C.F.R. §§ 260.11 and 261.22(a)(1) (1988–1993 Editions).

sample of the waste has either of the following properties:

(1) It is aqueous and has a pH less than or equal to 2 or greater than or equal to 12.5, as determined by a pH meter using either an EPA test method or an equivalent test method approved by the Administrator.... *The EPA test method for pH is specified as Method 5.2 in "Test Methods for Evaluation of Solid Waste, Physical/Chemical Methods"* (incorporated by reference, see 260.11).

40 C.F.R. § 261.22(a)(1) (1993 edition) (emphasis added).

The Second Edition of SW–846 was formally adopted as part of Section 260.11 on September 21, 1982.[19] The Second Edition of SW–846 contains a "Conversion Table" which correlates the section and method numbers used in the First Edition of SW–846 with "the location of their replacements" in the Second Edition. SW–846 describes this conversion table as giving "the replacements" of the methods used in the First Edition of SW–846. In this Table, Method 5.2 is expressly replaced with Method 9040. However, the language of the regulation, 40 C.F.R. § 261.22(a)(1), retained its reference to Method 5.2 even as it referred parties to SW–846. The Second Edition of SW–846, and the conversion table within it, remained in effect until August 31, 1993, when the Third Edition of SW–846 was adopted.[20]

Defendant WCI points out that the Second Edition of SW–846's cross-index supports the conclusion that Method 5.2 was replaced by Method 9040. Also, soon after the formal adoption of the Second Edition of SW–846, the U.S. EPA issued a Technical Amendment which also noted the change from Method 5.2 to Method 9040. 48 Fed.Reg. 15256 (1983). Further, WCI also points to communication made in 1993 by the EPA at the time it adopted the Third Edition of SW–846. In August 1993, the Agency formally clarified that "[t]he EPA method number for pH is incorrectly referenced in Section 261.22(a)(1) as Method 5.2. Therefore, the Agency is deleting the reference to Method 5.2 in that section and replacing it with the correct reference to Method 9040." 58 Fed.Reg. 46047 (1993). Thus, the EPA changed the regulations to reflect what had already been indicated in SW–846 for years: that Method 9040 replaced Method 5.2

In short, WCI argues that even though the *regulations* did not specifically mention Method 9040 until 1993, 40 C.F.R. § 261.22(a)(1) always defined corrosivity by reference to SW–846, in which Method 9040 replaced 5.2. Therefore, WCI argues that Method 9040 applied from at least 1984 to August 1993.

■ WCI makes a strong argument that Method 9040 was effective for the times relevant here. However, assuming the applicability of Method 9040, the Court finds that strict adherence to Method 9040 is not required to show that WCI violated RCRA. Reliability and accuracy of samples may be shown by methods other than Method 9040.

Arguing otherwise, WCI contends that corrosivity can only be established if the Plaintiff United States shows that Ponds 5, 6, and 6A had a pH of 2.0 or less using a pH meter in accordance with Method 9040. To comply with Method 9040, WCI says sampling must follow a statistically-valid sampling plan prepared in accordance with Section One of SW–846. Method 9040, § 6.1.

However, relevant language in SW–846 belies WCI's argument. SW–846 provides that a sampling plan is more statistically valid if it provides for "some form of random sampling" so that "every unit of the population (*e.g.* every location in a lagoon used to store a solid waste) has a theoretically equal chance of being sampled and measured," thus ensuring that "the sample

---

**19.** 47 Fed.Reg. 41562 (1982).

**20.** 58 Fed.Reg. 46040 (1993).

is representative of the population." Section One, SW–846, Second Edition, § 1.1.2.

"Sampling precision is *most commonly achieved* by taking an appropriate number of samples from the population." Section One, SW–846, Second Edition (emphasis added). SW–846 provides a statistical equation to be used in determining the "appropriate number of samples." [21] Compliance with the statistical calculations in SW–846 establishes " 'a scientifically credible sampling plan' for characterizing waste." *Id.* at Section 1. Specifically, SW–846 says that "solid wastes contained in a landfill or lagoon are [usually] *best* sampled using the three-dimensional random sampling strategy." *Id.* (emphasis added).

SW–846 also says that "[l]agooned waste that is either liquid or semisolid is often best sampled using the methods recommended for large tanks." In describing the method used for sampling large tanks, SW–846 says "a representative set of samples is best obtained using the three-dimensional simple random sampling strategy described in Section 1.4.1."

In Section 1.4.1 of SW–846, the EPA says:

> The number of samples required for reliable sampling will vary depending on the distribution of the waste components in the container. As a minimum with unknown waste, a sufficient number and distribution of samples should be taken to address any possible versicle anomalies in the waste.

SW–846 at 1.4.1.

Under these provisions, sampling of Ponds 5, 6, and 6A *should* involve "a three-dimensional grid of sampling points and then using random number tables or generators to select points for sampling." *Id.* at 1.4.4.

As indicated, Method 9040 suggests that sampling *should* be done consistent with a sampling plan involving a sufficient number of samples. While such sampling is preferred, WCI does not show that the

Plaintiff United States cannot proceed absent sampling in conformity with Method 9040.

Other courts have come to similar conclusions. In *United States v. Self,* 2 F.3d 1071 (10th Cir.1993), the defendant, facing criminal charges, argued that the government failed to present evidence that certain hazardous wastes were sampled in accord with an EPA-approved test method. Rejecting this argument, the Tenth Circuit held that "[w]hile an EPA-approved test of the material would have been persuasive evidence as to whether the material was hazardous waste, the government was not required to prove this element through test data." *Id.* at 1086.

To like effect, in *United States v. Baytank, Inc.,* 934 F.2d 599 (5th Cir.1991), the government brought a criminal claim under RCRA. In that case, the government did not have sampling of the relevant drums, nor other sampling taken in conformity with EPA regulations. Instead, it relied upon company documents and testimony from persons in contact with the relevant drums. In finding the evidence sufficient to support a criminal conviction, the Fifth Circuit held:

> The government admits no drum samples were taken, but relies on Baytank records, and testimony as to its practices at the times charged, to show that the drums were used to store the 'slops' or residue of hazardous chemicals that had been extracted either for sampling or line cleaning purposes. We agree that these documents, including drum inventories, a hazardous waste log, and internal memoranda, as well as the testimony at trial, all amply demonstrate that many of these drums containing hazardous wastes were stored for longer than 90 days.

*Id.* at 614.

Other courts have held that the failure to adhere to SW–846's precise framework

---

**21.** Table 1, Equation 8, in Section One of SW–846.

does not stop a finding of hazardous substances. *See, e.g., United States v. Taylor,* 802 F.Supp. 116, 119 (W.D.Mich.1992), *vacated on other grounds,* 8 F.3d 1074 (6th Cir.1993) (sample analyzed under a test method not approved by EPA sufficient to establish threat of contamination under CERCLA). Further, failure to rigidly adhere to SW–846 does not render the sampling evidence inadmissible. *People v. Hale,* 29 Cal.App.4th 730, 734, 34 Cal. Rptr.2d 690 (1994) ("We discern no per se rule which automatically precludes the introduction of evidence of disposal of hazardous waste just because the gathering of the sample does not follow every jot and tittle of the EPA manual."). Any deviation from the guidance goes to the weight of the evidence and not its admissibility. *People v. Sangani,* 22 Cal.App.4th 1120, 1136–1137, 28 Cal.Rptr.2d 158 (1994) ("Failure to follow precise regulatory or statutory requirements for laboratory tests generally does not render the test results inadmissible, but instead goes to the weight accorded to the evidence.").[22]

Consequently, although Method 9040 controlled sampling before 1993, the Court finds that strict adherence with Method 9040, including grid sampling pursuant to a plan, is not required to show that Ponds 5, 6, and 6A were corrosive. While sampling done in conformity with Method 9040 is preferable and more persuasive, evidence not conforming with the sampling provisions of SW–846 can support a finding that WCI generated hazardous substances subject to RCRA.

### 3. Required Showing

To show that Ponds 5, 6, and 6A contained hazardous substances and were, as a result, subject to the cradle-to-grave restrictions of RCRA, the Plaintiff United States must show, via representative samples, only that the surface impoundment contained aqueous water with a pH of 2.0 s.u. or less, on at least one occasion. *United ed States v. Conservation Chemical Co.,* 733 F.Supp. 1215, 1224 (N.D.Ind.1989) (finding that an aqueous solid waste exhibits the characteristic of corrosivity if it is properly tested and found to have a pH less than or equal to 2 "on at least one occasion"); *State v. PVS Chemicals, Inc.,* 50 F.Supp.2d 171 (W.D.N.Y.1998) (finding discharges of acidic water that fell below pH of 2 on 4 occasions out of 51 samples taken over course of 6 years was hazardous).

In order to be valid, sampling must show that it is random, that is, that "every unit of the population (*e.g.,* every location in a lagoon used to store a solid waste) has a theoretically equal chance of being sampled and measured," thus ensuring that "the sample is representative of the population." Section One, SW–846, Second Edition, at 1.1.2.

With these principles in mind, the Court examines the samples presented by the government as evidence of RCRA violations.

### C. Assessment of Samples

In claiming that Defendant WCI's Pond 5, 6, and 6A are subject to regulation under RCRA, the United States relies upon a limited number of testings done by U.S. EPA personnel and the large number of tests recorded by Defendant WCI's per-

---

**22.** Courts show deference to the interpretation of regulation given by administrative agencies charged with their enforcement. *United States of America v. Mobil Oil Corporation,* 1997 WL 1048911 (E.D.N.Y.1997). In *Mobil Oil,* the company sought to offer evidence not in conformity with the regulations given by the U.S. EPA. Rejecting Mobil's evidence, the court set forth a standard of review applicable to a claim that the sampling methods utilized are invalid. Under the court's test, it is not enough for WCI simply to "offer[ ] an alternative reading of the law." *Id.* at *9. Instead, WCI must establish that EPA's interpretation is "plainly erroneous" and that WCI's reading is " 'compelled by the regulation's plain language' or the Administrator's intent at the time the regulation was promulgated." *Id.* (quoting *Thomas Jefferson University Hospital v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)).

sonnel at the intake to the central treatment plant.

WCI says the limited number of samples taken by the U.S. EPA are insufficiently representative of the ponds to serve as proof of a violation. WCI also says the 11,000 samples it recorded are insufficiently representative of wastewaters held in Ponds 5, 6, and 6A because the measuring probes were miscalibrated. Because none of the samples the government relies on were taken pursuant to Method 9040, WCI says there is insufficient evidence that it maintained hazardous waste at the Warren facility.

As discussed, the Court finds Method 9040 preferable for showing a RCRA violation, but it is not the exclusive means with which the government can support its case. The Court must now determine whether the available samples provide a reliable indicator that WCI maintained hazardous waste at the Warren facility.

Plaintiff United States shows sampling performed by WCI at the influent to Pond 6. The government produced WCI's internal "Turn Audit" forms reflecting pH measurements taken between 1988 and 1998. WCI tested over 300 samples a month at Pond 6 during these years.[23] The turn audit forms indicate that over 11,000 samples taken during these years had a pH of 2.0 or less.[24] WCI's operators made readings of 2.0 s.u. or less for Pond 6 wastewater entering the central treatment plant on 1,361 separate days, including 577 days during which readings of 1.7 s.u. were taken at the influent probe.

During several months, virtually all the samples indicated low pH levels. In May 1991, 96.7% of the 369 samples taken that month indicated a pH level of 2.0 or below. In August 1991, 99.2% of the 372 samples taken that month registered at 2.0 or below, with 297 samples reflecting a pH of

1.7 or below. In May 1993, 90.9% of the 372 samples taken that month had a pH level of 2.0 or below, with 268 samples reading 1.7 or below.

At the rate WCI pumps water out of the pond, there is a complete turnover of pond water every three to four days. Thus, months during which low pH levels were the norm provide strong evidence that the samples were representative of the pond water as a whole during that time and that the water contained hazardous waste.

Though WCI levels valid criticism at the reliability of the influent pH probe, the measurements obtained from the probe are nevertheless probative of the wasterwater's hazardous nature. An extremely large number of influent probe pH readings show corrosivity, including many readings with very acidic pH levels. Even if the pH calibration were not precise, any error was unlikely to account for the extremely low pH readings.

This is so because pH is measured on a logarithmic scale: as pH measurements move down the scale, the measure of acidity in a substance increases exponentially. A substance with a pH of 1.8 s.u. has twice the hydrogen ion (or acid) concentration of a substance with a pH of 2.0 s.u. The difference between the measurement units is .2. But because of the logarithm, the .2 difference between 1.6 and 1.8 represents a greater increase in acidity level than does the .2 difference between 1.8 and 2.0. Therefore, even if WCI's probes were not calibrated precisely in relation to 2.0, the extremely low readings represent strong evidence of acidity because they represent such exponential change in acid levels.

Indeed, even SW–846 notes that when measurements fall far below the threshold allowed level, a method with lower accuracy and precision is tolerable:

**23.** In July 1990, WCI took 240 samples. In every other month during the ten-year period, WCI took more than 300 samples.

**24.** There were only 13 readings of 2.0 or less in 1995 and none in 1996 through 1998. Therefore, the bulk of the low pH readings date from 1988 to 1994.

It is now apparent that a judgment must be made as to the degree of sampling accuracy and precision that is required to reliably estimate the chemical characteristics of a solid waste for the purpose of comparing those characteristics to applicable regulatory thresholds. Generally, high accuracy and high precision are required if one or more chemical contaminants of a solid waste is present at a concentration that is close to the applicable regulatory threshold. *Alternatively, relatively low accuracy and low precision can be tolerated if the contaminants of concern occur at levels far below or far above their applicable thresholds.*

SW–826, § 1.1.1, ¶ 3 (emphasis added). Although high accuracy and precision is preferred, the reading of 1.3, for example, reliably shows corrosivity even if taken through a less than ideal sampling method because it falls so far below the threshold of 2.0.

The United States does not rely solely on the measurements from the influent probe. The United States gives evidence from a WCI consultant engineer who took grab sample pH measurements on October 14 and 15, 1993, which showed pH of 2.0 or lower at the bosh box location.[25] Importantly, one of these samples had the extremely low pH value of 1.3 s.u. while another had the extremely low value of 1.7 s.u. Also, a large number of grab bag samples, tested on bench pH meters, indicate corrosivity. Finally, although limited, U.S. EPA sampling shows corrosivity.

█ In light of the substantial evidence presented by the United States, the Court finds that during periods of WCI's· ownership, the wastewater treated, stored, and disposed of by WCI in Ponds 5, 6, and 6A exhibited the hazardous waste characteristic of corrosivity, within the meaning of 40 C.F.R. § 261.22. Thus, WCI Ponds 5, 6, and 6A were subject to RCRA.

However, the Government fails to show spent pickle liquor, subject to RCRA, was deposited into Ponds 5, 6, and 6A. The Court finds that WCI always neutralized any spent pickle liquor or acid spillage with excess lime. Lime-neutralized spent pickle liquor is exempt from the RCRA's hazardous waste regulations under the iron and steel industry exemption in 40 C.F.R. § 261.3(c)(2)(ii)(A).

## IV. Violations of RCRA

The Court has determined that there is sufficient evidence that WCI treated, stored, or disposed of hazardous waste at its Warren facility. Maintaining such hazardous waste triggers several requirements under RCRA. As detailed below, WCI's failure to comply with these requirements subjects it to penalties under RCRA.

### A. First Claim for Relief

40 C.F.R. § 260.10 provides, in part:

[A] "Hazardous waste management unit" is a contiguous area of land on or in which hazardous waste is placed, or the largest area in which there is significant likelihood of mixing hazardous waste constituents in the same area. Examples of hazardous waste management units include a surface impoundment, a waste pile, a land treatment area, a landfill cell, an incinerator, a tank and its associated piping and underlying containment system and a container storage area.

40 C.F.R. § 260.10. Ponds 5, 6, and 6A at the WCI's Warren facility are hazardous waste management units. As hazardous waste management units, Ponds 5, 6, and 6A are subject to the provisions of RCRA and analogous state law.

Under 42 U.S.C. § 6925(a) and (e) and Ohio Rev.Code §§ 3734.02(F) and 3734.04, the owner and operator of a hazardous waste management unit is prohibited from

---

**25.** Consultant Killam collected three grab samples from the bosh box that channels wastewater to the surface impoundments.

The three samples had pH values of 1.3, 1.7 and 2.0 s.u., respectively.

operating a hazardous waste management unit except in accordance with a permit issued pursuant to RCRA, unless the facility had interim status.

The wastewater treated, stored, and disposed of through the impoundments was a "solid waste," under 40 C.F.R. § 261.2(a)(2). During periods from 1988 to 1993, the wastewater stored and disposed of by WCI in Ponds 5, 6, and 6A, was also hazardous waste because it exhibited the characteristic of corrosivity, having a pH of 2 or less. Further, Defendant WCI has neither a permit issued pursuant to the provisions of 42 U.S.C. § 6925, nor does WCI have interim status.

Defendant WCI's operation of Ponds 5, 6, and 6A without a permit and without interim status violates RCRA and the federally approved hazardous waste management program for the State of Ohio. Each day that WCI operated Ponds 5, 6, and 6A without a permit or without interim status is a separate violation of RCRA.

### B. Second Claim for Relief

Ponds 5, 6, and 6A were hazardous waste management units during periods from 1988 to 1993. WCI operated these hazardous waste management units without including these hazardous waste management units in any RCRA Part A application, as required by 40 C.F.R. § 270.13 and O.A.C. § 3645-50-43, and without amending any RCRA Part A application.

Each day that Defendant operated Ponds 5, 6, and 6A without including these hazardous waste management units in any Part A application and without amending any Part A application is a separate violation of 42 U.S.C. § 6930 and O.A.C. § 3745-50-43.

### C. Third Claim for Relief

WCI operated Ponds 5, 6, and 6A as hazardous waste management units without including these hazardous waste management units in any RCRA Part B application, and without amending any RCRA Part B application to include information pertaining to Ponds 5, 6, and 6A. 40 C.F.R. § 270.14 and O.A.C. § 3745-50-44.

Each day that WCI operated Ponds 5, 6, and 6A as hazardous waste management units without including these hazardous waste management units in any RCRA Part B application, and without amending any RCRA Part B application to include information pertaining to Ponds 5, 6 and 6A is a separate violation.

### D. Fourth Claim for Relief

Under 42 U.S.C. § 6928(a) and 40 C.F.R. § 270.1(b), a party also may not store hazardous waste in a surface impoundment without a permit or interim status. Ponds 5, 6, and 6A are "surface impoundments" within the meaning of 40 C.F.R. § 260.10.

Under 42 U.S.C. § 6925(j), surface impoundments existing on November 8, 1984, were required to meet minimum technological requirements unless granted an exemption by the U.S. EPA or the State.[26] WCI did not receive interim status. As a facility that did not have a permit and did not have interim status, WCI was required to cease accepting hazardous waste and commence closure. 40 C.F.R. § 265.1(b). As explained earlier, the Court finds that WCI continued to receive hazardous waste after it was not eligible to do so. In continuing to receive hazardous substances, WCI violated RCRA.

WCI continued accepting hazardous wastes at Ponds 5, 6, and 6A, even though it failed to meet the technological requirements of 42 U.S.C. § 6924(o)(1)(A). WCI failed to close Ponds 5, 6, and 6A as required by 40 C.F.R. § 264.228 and O.A.C. § 3745-56-28.

Each day that WCI continued accepting hazardous wastes at Ponds 5, 6 and 6A, even though it failed to meet the technological requirements of 42 U.S.C. § 6924(o)(1)(A) is a separate violation.

**26.** 42 U.S.C. § 6924(o).

### E. Fifth Claim for Relief

Under 40 C.F.R. § 264.112 and O.A.C. § 3745–55–12, WCI, as the owner or operator of a hazardous waste management unit, was required to have a written closure plan. The closure plan must identify the steps needed to perform a partial or final closure of the facility.

Defendant WCI failed to have a written closure plan that identified the steps necessary to perform partial or final closure of Ponds 5, 6, and 6A. WCI thus violated RCRA closure requirements described at 40 C.F.R. § 264.112 and O.A.C. § 3745–55–12.

Each day that WCI failed to have a written closure plan that identified the steps necessary to perform partial or final closure of Ponds 5, 6, and 6A is a separate violation.

### F. Sixth Claim for Relief

Under 40 C.F.R. §§ 264.140 – 264.151 and O.A.C. §§ 3745–55–40 – 3745–55–51, WCI, as the owner or operator of a hazardous waste management facility, was required to have a detailed written estimate in current dollars of the cost of closing hazardous waste management units. WCI was also required to comply with the financial assurance provisions of 40 C.F.R. § 264.143 and O.A.C. § 3745–55–43.

Defendant WCI has failed to comply with the closure costs and financial assurance requirements of 40 C.F.R. Part 264 and O.A.C. §§ 3745–55–40–3745–55–51. Each day that WCI failed to have and maintain a detailed written estimate, in current dollars, of the cost of closing hazardous waste management units to comply with the financial assurance requirements is a separate violation.

### G. Seventh Claim for Relief

The owner or operator of a surface impoundment is required to install, operate, and maintain a ground-water monitoring system which satisfies the criteria contained at 40 C.F.R. Part 264, Subpart F, and O.A.C. §§ 3745–54–90 – 3745–54–99 and 3745–55–01 – 3745–55–02. During periods after November 8, 1988, WCI failed to install, operate, and maintain a ground-water monitoring system that meets the requirements of 40 C.F.R. Part 264, Subpart F, and O.A.C. §§ 3745–54–90 – 3745–55–02.

The failure to operate such a ground-water monitoring system violates RCRA and the federally approved hazardous waste management program for the State of Ohio.

### H. Eighth Claim for Relief

At times from 1988 to 1993, Defendant WCI disposed of corrosive hazardous waste, having a pH of less than or equal to 2.0, from Ponds 5, 6 or 6A, which did not meet the treatment standards specified at O.A.C. §§ 3745–59–40–3745–59–43, in violation of 40 C.F.R. §§ 268.32 and 268.35(a) and O.A.C. §§ 3745–59–32 and 3745–59–35(A).

In disposing of such waste, WCI violated RCRA and the federally approved hazardous waste management program for the State of Ohio.

### V. Penalty

Under 42 U.S.C. § 6928(a) and (g), this Court has power to enjoin WCI and to impose civil penalties for each violation of RCRA and the hazardous waste management program for the State of Ohio. This Court can impose penalties up to $25,000 per day for each day of violation prior to January 30, 1997 and $27,500 for each day of violation thereafter.

■ In determining the appropriate civil penalties, the Court considers the seriousness of the violation, what efforts were made to comply with regulations, the harm caused by the violation, the economic benefit derived from noncompliance, the violator's ability to pay, the government's conduct, and the clarity of the obligation involved. *United States v. Ekco Housewares, Inc.*, 62 F.3d 806, 815 (6th Cir. 1995). In determining the penalty, this Court exercises its discretion. *Id.* (citing

*United States v. Midwest Suspension and Brake,* 49 F.3d 1197, 1205 (6th Cir.1995)).

### A. WCI's Past Compliance and Seriousness of the Violation

From the time it assumed operation of the Warren facility in 1988, WCI has denied that it managed hazardous wastes in Ponds 5, 6 and 6A. Because it denied its management of hazardous wastes, WCI failed to provide notice to the U.S. EPA and the State that it managed hazardous wastes in Ponds 5, 6 and 6A and failed to obtain any permit or interim status under RCRA for management of the hazardous waste it maintained in Ponds 5, 6, and 6A.

42 U.S.C. § 6925(a) prohibits the treatment, storage or disposal of hazardous waste except in accordance with an authorized permit. *Ekco Housewares, Inc.,* 62 F.3d at 809. The receipt of a permit, and compliance with that permit are at the core of the federal hazardous waste management system. *United States v. Heuer,* 4 F.3d 723, 730 (9th Cir.1993) ("It is fundamental that an entity which performs a hazardous waste activity for which a permit is required under RCRA may not legally perform that activity unless it has a permit for the relevant activity."). WCI's failure to obtain a permit and to comply with that permit disregards RCRA's " 'cradle-to-grave' regulatory structure overseeing the safe treatment, storage and disposal of hazardous waste." *United Technologies Corp. v. EPA,* 821 F.2d 714, 716 (D.C.Cir.1987).

Yet, WCI has made capital investments that have improved environmental quality. By 1992, WCI had invested $135 million in a continuous caster and ladle metallurgical facility that lowered costs and improved environmental performance.[27] In addition, WCI used a vigorous recycling program and eliminated about 80,000 tons of materials that formerly went to a landfill. In 1996, the Ohio EPA reported that: "WCI

has achieved an 86 percent reduction in their toxic chemical releases from 1988 to 1994 ... 1994 was WCI's most productive year in their eight-year history. The facility increased production by 5.8 percent over 1993 while reducing toxic release commission by 32.9 percent." In March 1999, the Environmental Defense Fund placed WCI in the top third of twenty integrated steel mills in the nation for its pollution control efforts.

In summary, while Defendant WCI failed to comply with RCRA requirements as to Ponds 5, 6, and 6A, it otherwise made efforts to reduce pollution.

### B. Discussion of Harm Caused by Noncompliance

The Court finds no credible evidence of harm caused by Defendant WCI's RCRA violations. First, though long-term effects of hazardous wastewater may be reflected in the sludge that collects in the beneath the wastewater, the Plaintiff United States does not allege that sludge in the Ponds ever had a pH of 2.0 or below. Second, monitoring wells placed downstream from Ponds 5, 6, and 6A show no impact on the environment resulting from the use of these ponds as wastewater treatment units. Finally, the United States does not allege that the Ponds currently contain wastewater with a pH of 2.0 or below.

Where a proven violation of RCRA does not result in "the creation of a situation with the potential to seriously harm the environment," civil penalties have been substantially reduced. *United States v. Lacks Industries, Inc.,* 1990 WL 261387, *4 (W.D.Mich. June 22, 1990). Thus, in determining an appropriate penalty, this Court takes into consideration the fact that WCI's use of Ponds 5, 6, and 6A has not resulted in any harm to human health or the environment.

---

27. The continuous caster and ladle facility eliminated approximately a hundred tons of

air pollutants per year.

C. Economic Benefit and Costs Saved

The Court also considers the economic benefit derived by WCI as the result of its failure to comply with RCRA. On this issue, the parties sharply disagree.

The Plaintiff United States says that WCI benefitted because it avoided expending monies to close Ponds 5, 6, and 6A, including dredging, disposal of dredged materials, and backfilling the ponds. The United States argues that WCI benefitted because it was otherwise required to install tanks to store wastewater with low pH; to set up a groundwater monitoring program; and to provide a closure and post closure plan together with necessary financial assurance. The United States says WCI delayed or avoided expending monies for these purposes and received an economic benefit.

In seeking to quantify this benefit, the United States says the benefit should be measured as the current value of the capital cost of the various expenditures needed to avoid RCRA violations, and the annual operating costs that would have attended earlier compliance, all expressed in today's dollars.

Plaintiff United States claims that Defendant WCI received a total economic benefit of approximately $9.1 million. According to the United States, the delayed capital expenditures gave WCI a $6,427,-000 benefit and the avoidance of operating and maintenance costs gave WCI a $2,631,000 benefit.

In reaching its position that WCI obtained economic benefit of $9.1 million, the United States relies on several core assumptions. The United States relies upon the argument that remediation required moving the majority of the sludges from their current locations and depositing them in a toxic waste disposal site. If the sludge did not have to be removed, WCI did not receive the benefit of $2,615,102 for the dredging and backfilling of the impoundments and $3,696,690 for its disposal.

The Court finds credible WCI's testimony that Ponds 5, 6, and 6A are subject to a risk-based closure that gives consideration to human health and the environment. Under such a closure, the sludge would be left in place, it would be stabilized, and a cover would be placed upon it. Such a risk-based closure might involve moving the sludges from Ponds 6 and 6A to Pond 5, and then putting a cover on Pond 5. A risk-based closure would be significantly less expensive than the dredging and removal plan proposed by the United States. Dr. Kenneth Wise testified credibly that a risk-based resulted in a present value economic benefit of $732,065, including the cost of a storage tank.

D. Present Value Determination

As to the economic benefit derived by WCI from delayed compliance with RCRA, the parties also dispute what rate should be used to determine the present value of the benefit. The Plaintiff United States claims that this Court should use a weighted average cost of capital rate of 8.5 percent for both past amounts benefitted and for future benefits.

In contrast, the Defendant WCI suggests that the rate should be different for both past and future benefit. For past costs, WCI suggests the use of an after-tax, risk-free rate is correct. WCI argues that no uncertainty attends the amount and the risk-free return is the only economic benefit that a company earns from delaying an expenditure. WCI argues that any return above the risk-free rate does not reflect delay, but instead reflects risk.

As to future benefit, WCI says there is uncertainty. Future benefits are not risk free. As a result, WCI says a discount rate reflecting this risk should be used. Specifically, WCI argues that future benefits should be computed by using an after-tax corporate borrowing rate. WCI suggests a 9.6 % rate should be used, based upon the current yield of WCI bonds.

■ The central issue is whether a rate reflecting risk should be used as to past benefits or obligations. Any return above the risk-free rate is earned not from delay but by assuming risk, and therefore is not properly considered economic benefit from noncompliance. Because this amount is known and the existence and solvency of the party is also known, it is inappropriate to increase the rate to reflect risk. As to this issue, the Court finds Defendant WCI's argument to be more persuasive. After observing the testimony of all the experts, the Court finds WCI's expert Kenneth Wise most credible.

In determining economic benefit, the Court therefore finds an after-tax, risk-free rate is correct.

### E. Period for Determination of Economic Benefit.

For determining economic benefit, the Plaintiff United States says that computation should accrue from the initial dates of noncompliance until actual compliance is achieved. Thus, the United States argues that economic benefit should be calculated from November 1988, the first date of noncompliance.

■ RCRA encompasses both current and continuing violations, even if the latter originated in activities occurring before the applicable date of the statute. *State v. PVS Chemicals, Inc.,* 50 F.Supp.2d 171, 180 (W.D.N.Y.1998). Thus, there is little doubt that the Court may consider WCI's conduct prior to May 11, 1993, to determine whether WCI is subject to, and violated, RCRA.

However, the assessment of a civil fine for such a violation is limited by the federal statute of limitations found in 28 U.S.C. § 2462:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, . . . [or] penalty . . . shall not be entertained unless commenced within five years

from the date when the claim first accrued.

28 U.S.C. § 2462. Thus, while the economic benefit WCI received from violating RCRA prior to May 11, 1993 may be relevant to an examination of the extent of the violations, the scope of injunctive relief, and WCI's good faith in remedying known violations, it is not determinative of this Court's assessment of a fine.

### F. Ability to Pay

The Plaintiff United States and Defendant WCI dispute WCI's ability to pay a substantial penalty. The United States argued that WCI could and should pay a penalty of $34 million. In major part, the United States bases this position upon certain high dividends that WCI paid its corporate owner in recent years.

WCI challenges its ability to pay such a penalty with impunity. WCI says it needs to invest $40 million in capital annually and this investment would be impaired by such a penalty.

WCI has made profits in some recent years. However, it faces increased competition, especially during business downturns, from numerous competitors. First, cheap Asian steel has flooded the U.S. and world markets. As a result, U.S. steel imports increased 33% from 1997 to 1998, despite the fact that 1997 itself recorded high imports. As a result of these imports and the consequent competition, prices will remain low, with lower profit margins.[28]

Second, mini-mill capacity has also increased, resulting in lower prices and margins. This problem is likely to continue.

Third, this price competition with resulting pressure on margins has occurred during a time of economic expansion. When the inevitable downturn occurs, the pressure on producers will increase. As an unaffiliated operation, WCI will likely face

---

**28.** Hot rolled steel prices declined from $25.32 per 100 pounds in 1995 to $22.46 in 1996, to $18.12 in 1997, and to about $14 in 1998.

even greater pressure during the next contraction.

Operating income, after taking away unrelated financial expenses, declined from $77 million ($58 per ton) in 1997 to $62 million ($44 per ton) in 1998. For the most recent quarter, ending January 31, 1999, WCI's operating income was a $613,000 loss compared to a $14,279,000 profit in the first quarter of the previous year. Capital expenditures declined from $39.9 million in 1997, to $35.4 million in 1996, to $15.6 million in 1998.

Taken as a whole, the Court finds that Defendant WCI does not have ability to pay any significant penalty and remain extant in the long term. Simply put, the Court credits testimony that WCI faces long odds for survival in an industry characterized by excess capacity, unrestrained dumping by foreign producers, and uncertain future demand in the next downturn.

### G. The Government's Conduct

In fashioning a penalty, the Court considers the government's conduct. Since 1981, the Ohio EPA has conducted at least twelve hazardous waste compliance inspections of the WCI facility. After making these inspections, the Ohio EPA did not allege that Ponds 5, 6, and 6A were hazardous waste units subject to RCRA. In 1993, the Ohio EPA gave WCI a RCRA Part B permit for the storage of acid prior to recycling.

The U.S. EPA also inspected WCI's facility under the Clean Water Act and RCRA in 1990, 1991, and 1992. After conducting these inspections, the U.S. EPA inspectors did not allege that the Ponds were hazardous waste units.

Beginning in May 1993, the U.S. EPA made a "multimedia" inspection at WCI's Warren facility. This multimedia inspection was made under the Clean Water Act, the Clean Air Act, RCRA, and the Toxic Substances Control Act. Shortly after conducting this inspection, the U.S. EPA requested documents from WCI.

By early spring, 1994, Defendant WCI had produced documents requested by the U.S. EPA. With this production, WCI gave the U.S. EPA the "Turn Audits" forms recording the readings from the pH meters located at the aeration influent box, the aeration tank, the rapid mix tank, and the No. 3 clarifier. This data reflected readings every two hours from September 1, 1988. The Turn Audits also reflected the records of the grab sample pH measurements for Pond 6 influent wastewater.

Despite having this most important evidence in early 1994, the government delayed filing this action until May 11, 1998. The government delayed filing even though it had filed a Clean Water Act action against WCI in June 1995.[29] The U.S. EPA delayed filing even though the EPA and WCI had reached a settlement of the Clean Water Act suit in April 1998 and even though that settlement made provision for the remediation of Pond 6 and to fill in Pond 6A.

As described above, the government delayed resolution of this dispute. First, the government delayed investigation of WCI's wastewater handling methods despite knowledge that WCI used processes that are acidic. While RCRA requires self-reporting, the government's inattention delayed this action.

Second, even when it had suspicion and necessary information, the United States delayed this action more than four years. Moreover, it delayed this action despite expending large resources for discovery in the 1995 Clean Water Act case and despite settlement efforts in that case.

The government's delay and the government's splitting of causes of action are taken into account in setting the penalty imposed upon WCI. *United States v. Bethlehem Steel Corp.*, 829 F.Supp. 1047, 1056–58 (N.D.Ind.1993). "[C]ourts should respond to EPA's undue agency delay by reducing penalties in an enforcement ac-

---

29. *United States v. WCI Steel, Inc.*, Civil Action No. 4:95CV1442 (N.D.Ohio).

tion in order to counteract any incentive the agency might have to place itself in a superior litigating position." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1337 (5th Cir.1996).

### H. Penalty Finding

 The United States requests a per diem penalty for each violation. This Court will not do so as it is within this Court's discretion to determine the total amount of penalty that WCI should pay. However, the Court considers the total days of violation in setting the penalty. *Bethlehem Steel Corp.*, 829 F.Supp. at 1056 (citing *United States (EPA) v. Environmental Waste Control, Inc.*, 710 F.Supp. 1172, 1242 (N.D.Ind.1989)). The Court does not assume a $25,000 or $27,500 per day fine but rather views the evidence in total to determine a single penalty. In setting the penalty, the Court recognizes that deterrence is the major purpose of a civil penalty. *Id.*

 After considering Defendant WCI's violations, the economic benefit it has obtained, the government's undue delay in bringing this action, the Court hereby assesses a civil penalty against WCI in the amount of $1 million.

### I. Injunctive Relief

42 U.S.C. § 6928(a) gives the Plaintiff United States the power to file a civil action to obtain appropriate relief. The relief sought can include a temporary or permanent injunction.

 Normally, to obtain injunctive relief, a party must prove that there is no adequate remedy at law, that the plaintiff may suffer an irreparable injury if an injunction is not granted and that the balance of the equities justifies an injunction. However, when the government brings the action and shows that an activity endangers public health, injunctive relief is proper without undertaking a balancing of the equities. *Environmental Defense Fund, Inc. v. Lamphier*, 714 F.2d 331, 337–38 (4th Cir.1983); *United States v. Bethlehem*

*Steel Corp.*, 38 F.3d 862, 868 (7th Cir.1994). In cases of public health legislation, the emphasis shifts from consideration of irreparable injury to concern for the general public interest. *Id.*

The United States does not allege that Ponds 5, 6, and 6A currently contain wastewater with a pH of 2.0 or below. There have been no influent probe readings of 2.0 or below after 1995. The sludge lining Ponds 5, 6, and 6A does not have a pH of 2.0 or lower and there is no evidence that it ever did have such a low pH. Consequently, the United States' request for injunctive relief does not purport to correct ongoing conditions that pose any type of public health risk or risk to the environment.

 In deciding whether the strong remedy of injunctive relief should be given, the Court is most concerned with whether this relief is necessary to stop the danger that might result from violations of RCRA. Specifically, is injunctive relief necessary to stop WCI from receiving, handling, or disposing of corrosive wastes into Ponds 5, 6, and 6A? In circumstances where no evidence shows that corrosive wastes have been present in Ponds 5, 6, and 6A since at least 1995, the Court finds that injunctive relief is not necessary.

As described above, the Plaintiff United States filed an action in June 1995, alleging Clean Water Act violations with regard Ponds 5, 6, and 6A. With regard to that action, the United States used the same basic evidence that it uses in this case. The United States then settled this Clean Water Act case. As part of this settlement, the United States agreed to a Consent Decree. In that Consent Decree, the United States agreed that WCI should install a liner in Pond 6 and to fill in Pond 6A. Given the United States's agreement that WCI install a liner, it is inconsistent to now argue that Pond 6 must be closed to preserve public health.

Finding that the Plaintiff United States fails to show any imminent threat to health or the environment, the Court denies the United States request for injunctive relief.

## VI. CONCLUSION

For the reasons stated herein, the Court assesses a $1 million fine against Defendant WCI. The Court finds injunctive relief inappropriate in this case.

Accordingly, this action is terminated pursuant to Fed.R.Civ.P. 58.

IT IS SO ORDERED.

## ORDER

The Court has entered its findings of fact and conclusions of law in the above-captioned case. For the reasons set forth therein, the Court orders Defendant WCI Steel, Inc. to pay a civil fine of $1 million. Finding that WCI's RCRA violations pose no threat to the public health, the Court denies the United States' request for injunctive relief.

Accordingly, this action is terminated pursuant to Fed.R.Civ.P. 58.

IT IS SO ORDER.